# UNITED STATES OF AMERICA *v.* PACIFIC AND ARCTIC RAILWAY AND NAVIGATION COMPANY, PACIFIC COAST STEAMSHIP COMPANY, ALASKA STEAMSHIP COMPANY, CANADIAN PACIFIC RAILROAD COMPANY.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR ALASKA, DIVISION NO. 1.

No. 697.   Argued February 26, 1913.—Decided April 7, 1913.

While under the Interstate Commerce Act a carrier may select its through route connections, agreements for such connections may constitute violations of the Anti-trust Act if made not from natural trade reasons or on account of efficiency, but as a combination and conspiracy in restraint of interstate trade and for the purpose of obtaining a monopoly of traffic by refusing to establish routes with independent connecting carriers.

In reviewing the decision of the lower court sustaining a demurrer to an indictment charging a combination in violation of the Anti-trust Act, this court is not called upon to consider what the elements of the plan may be independently, or whether there is or is not a standard of reasonableness which juries may apply. If a criminal violation of the act is charged, the criminal courts have cognizance of it with power of decision in regard thereto.

A combination made in the United States between carriers to monopolize certain transportation partly within and partly without the United States is within the prohibition of the Anti-trust Act, and

also within the jurisdiction of the criminal and civil law of the United States even if one of the parties combining be a foreign corporation.

While the United States may not control foreign citizens operating in foreign territory, it may control them when operating in the United States in the same manner as it may control citizens of this country.

The purpose of the Interstate Commerce Act is to establish a tribunal to determine the relation of communities, shippers and carriers, and their respective rights and obligations dependent upon the act, and the conduct of carriers is not subject to judicial review in criminal or civil cases based on alleged violations of the act until submitted to and passed on by the Commission.

*Quære*, what the effect is of a finding by the Interstate Commerce Commission in such a case.

Where the District Court holds that the averments of the indictment are not sufficient to connect certain defendants with the offense charged, it construes the indictment and not the statute on which it is based, and this court has no jurisdiction under the Criminal Appeals Act to review the decision.

An objection to the demurrer made by certain defendants and sustained as to one count, and not passed on as to other counts which were struck down by the District Court but sustained by this court, may be raised in the District Court by such defendants in regard to such counts when the case is again before that court.

INDICTMENT for alleged violations of the Sherman Antitrust Act and of the Interstate Commerce Act.

The indictment contains six counts. The first and second counts charge violations of the Anti-trust Law. The first by the defendants engaging in a combination and conspiracy in restraint of trade and commerce with one another to eliminate and destroy competition in the business of transportation in freight and passengers between various ports in the United States and British Columbia in the south, and the various cities in the valleys of the Yukon River and its tributaries, both in British and American territory, in the north, upon a line of traffic described, for the purpose and with the intention of monopolizing such trade and commerce. The second count charges the monopolization of trade and commerce in the

same business and between the same ports. The manner of executing the alleged criminal purpose is charged to be the same in both counts.

The places of the incorporation of the corporate defendants are alleged, and the following facts: The Pacific Coast Steamship Company and the Alaska Steamship Company operate respectively lines of steamships as common carriers of freight and passengers running in regular route between Seattle, State of Washington, and Skagway, Alaska. The Canadian Pacific Railway Company is a like carrier and operates a line of steamships between Vancouver, British Columbia, and Skagway. During the time mentioned in the indictment the Pacific & Arctic Railway & Navigation Company owned and operated a railroad from tidewater at Skagway to the summit of White Pass, a distance of about twenty miles to the boundary line between Alaska and British Columbia, at which latter point it connected with a railroad owned and operated by the British Columbia Yukon Railway Company. The latter road extended from the summit of White Pass to the east shore of Lake Bennett and the boundary line between British Columbia and Yukon District of Canada, a distance of about twenty-five miles, at which point it connected with another railroad, owned and operated by the British Yukon Railway Company, which extends to White Horse on the headwaters of the Yukon River, in Yukon District of Canada. During all the times mentioned there was a line of steamers plying upon the Yukon River and the headwaters thereof between White Horse and Dawson, owned and operated by the British Yukon Navigation Company. The four corporations last above mentioned and their stocks and bonds were owned and controlled by the same persons and individuals, and the said three lines of railroads and their lines of steamers were under one and the same management and were operated as one continuous line

of common carriers of freight and passengers between the towns of Skagway and Dawson and way points under the name and style of the White Pass and Yukon Route, referred to as "the railroad" and had the sole and exclusive monopoly of the transportation business between Lynn Canal and the navigable waters of the Yukon River. A general trade and commerce was carried on between British Columbia and Puget Sound ports and the Yukon Valley, both in American and British territory, over the designated routes and to the various places on the routes, and the shortest and most natural route for such trade and commerce was, has been, and is by water craft from said southern ports to Skagway, and thence over Moore's Wharf, so called, to the points of destination. Trade and commerce from White Horse and Dawson to said southern ports would naturally, when left untrammeled by unlawful interference, move up the Yukon to the headwaters of that river and thence by the way of said railroad to Skagway, Alaska, thence over said Moore's Wharf, and thence by steamship or other water craft to the said southern ports.

The North Pacific Wharves & Trading Company was the owner and in exclusive possession and control of all of the wharves at Skagway at which steamships or other water crafts could take and discharge, or load cargo, that company having a complete and absolute monopoly of the wharfage business at Skagway and owning and operating the Moore Wharf, which wharf, by agreement between the Wharves Company and the railroad, had been made and was the terminus of the railroad over which all freight going to or coming from or passing through Skagway had necessarily to pass. The wharf was operated as a public wharf. Continuously during the three years immediately preceding the finding of the indictment the defendants combined and conspired together to eliminate and destroy competition in the transportation business between the said southern ports and Skagway, for the purpose and

with the intention of giving to and creating for the Alaska Steamship Company, the Pacific Coast Steamship Company and the Canadian Pacific Railroad Company a monopoly of such business, and, to that end, purpose and intention, entered into, and continuously maintained a joint traffic arrangement between the railroad and the steamship companies, by and through the individual defendants as officers and agents of the corporate defendants, pursuant to which arrangement either of the steamship companies could and did bill freight and passengers through from either of the said southern ports to any point on the said railway or on said Yukon River or its tributaries along and over the route of travel and transportation described, and the railroad could and did bill freight and passengers through from Yukon and other northern points to said southern ports only on ships from Skagway south, billing to either of the steamship companies. The rates for freight and passengers were fixed and an apportionment between the said respective carriers of the gross receipts was established and agreed upon. With the like intent and purpose it was agreed that the railroad should, and it did, refuse to enter into any joint through traffic arrangement with any other carrier or carriers, and refused to receive any other through billing on shipments from the said southern ports except such as arrived at Skagway by some ship belonging to one of the steamship companies, or from said Yukon points to the southern ports, except by the same ships. As part of the same combination and with the same intent and purpose it was agreed that the Wharves Company should, and it did, during all the times mentioned, charge wharfage at the rate of $2.00 per ton for all freight handled over its wharf except when the same was shipped on a vessel owned by either of the companies, or was consigned to some one who had entered into or was about to enter into a contract with either of said steamship companies to

bind himself to have all of his freight carried by such steamship company and by no one else, in which latter case a wharfage of $1.00 per ton only was charged and any charge in excess of $1.00 was unreasonably high and was exacted for the unlawful purpose aforesaid. With like intention and purpose and as part of the same combination and conspiracy, it was arranged and agreed by and between the defendants that the said railroad should, and it accordingly did, fix and establish local rates and transportation charges for freight and passengers from 5% to 25% higher than the through joint rates, differing according to classification of the various commodities shipped. Pursuant to such arrangement and the purpose and intention aforesaid, the said railroad received for through shipments, as its share of freight charges, from 15% to 30% less than it charged for the same class of freight shipped between Skagway and the same Yukon points. By reason of the facts alleged it became and was, during all of the time mentioned, unprofitable for the public to employ any carrier in the trade, traffic or commerce save and except the said steamship companies, and competition in the said water transportation between the steamship companies and other carriers was in that manner and by the means of said combination and conspiracy eliminated and destroyed, the defendants being enabled to monopolize such trade, traffic, transportation and commerce to the injury of the public.

The third count charged an unlawful and unjust discrimination in the transportation of passengers and freight, in violation of the Interstate Commerce Act. The discrimination is charged to have been practiced against the Humboldt Steamship Company between January 1, 1909, and August 10, 1910, which company is alleged to be a California corporation and engaged as a common carrier of freight and passengers operating a line of steamers from the same ports from which the defendant steamship

companies operate their respective lines to Skagway, Alaska. In the conduct of its business the Humboldt Steamship Company operated a steamship called the "Humboldt" on a regular schedule and route between Seattle, Washington, and Skagway. "The railroad," as we have seen the White Pass & Yukon route is called in all of the counts, had entered into and maintained during the time aforesaid with the defendant steamship companies a joint traffic arrangement whereby and under the terms of which freight and passengers might be billed at a joint through rate from the said southern ports over the route described to the various Yukon points, but refused without cause or excuse to enter into a joint traffic arrangement with the Humboldt Company, though requested to do so, or to receive, carry or handle any freight billed through from Seattle to Yukon points on the railroad or the Yukon River; and neither would nor did carry any freight whatever from Skagway to any of said points in British or American territory at a less rate or charge than from 5% to 30% more, according to classification and character, than it received from the defendant steamship companies as its proportion of joint through rates from such southern points to the corresponding Yukon points. The railroad company, it is charged, caused the North Pacific Wharves & Trading Company to charge for all freight shipped on the steamship "Humboldt" for transshipment on the railroad to points along its line on the Yukon River a wharfage of $2.00 per ton, whereas it included at the same time in its portion of the through rate on through bills under its arrangement with defendant steamship companies all wharfage charges. And it is alleged that the defendants knowingly, willfully and maliciously induced and incited the railroad company to practice the discrimination described, and each and all aided and abetted one another and the railroad company in such practice.

The other facts as to routes, commerce and carriers, their relations and arrangements and the effect of them are the same as in the first and second counts, the order of statement being somewhat different.

Count 4 is the same, as to the facts alleged, as the third count except the discrimination is charged to have been practiced against the Humboldt Steamship Company between August 18, 1910, and January 1, 1912.

Count 5 brings the discrimination charged down to the finding and presentation of the indictment. There is no allegation of discrimination in wharfage charges.

Count 6 charges the crime of conspiracy to commit an offense, against the United States by destroying competition between the defendant steamship companies and the Humboldt Steamship Company. The same facts are alleged as in the other counts.

Motions to quash the indictment and each of its counts were made and denied. Demurrers to the indictment were filed and sustained to all counts but the sixth. To that, the demurrer of the individual defendants was sustained.

*Mr. Solicitor General Bullitt* for the United States:

The United States may indict for violations of the Sherman Anti-trust Act without the necessity of any prior action by the Interstate Commerce Commission on the facts involved.

An act may be in violation of the Sherman Anti-trust Law without being in violation of the Interstate Commerce Act. *Meeker* v. *Lehigh Valley R. R. Co.,* 183 Fed. Rep. 548; *Texas R. R. Comm'n* v. *A., T. & S. F. Ry. Co.,* 20 I. C. C. Rep. 463, 465; *United States* v. *Joint Traffic Ass'n,* 171 U. S. 505; *United States* v. *Trans-Missouri Ass'n,* 166 U. S. 290.

The Interstate Commerce Commission has nothing to do with prosecutions under the Anti-trust Act.

The United States may indict for unjust discriminations,

&c., in violation of the Interstate Commerce Act without the necessity of first having the Interstate Commerce Commission determine the legality or propriety of the acts complained of.

The Interstate Commerce Commission has powers as between carriers and shippers but not as between the United States and carriers or shippers.

Different rules govern applications by shippers for relief in the courts from those governing the United States. (*a*) In the light of reason. (*b*) The provisions of the statute. (*c*) Under the authorities.

For suits between private parties see *Atlantic Coast Line* v. *Macon Grocery Co.*, 166 Fed. Rep. 206; *B. & O. R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481; *Columbus Iron Co.* v. *Kanawha Ry. Co.*, 171 Fed. Rep. 713; *Houston Coal Co.* v. *N. & W. Ry. Co.*, 171 Fed. Rep. 723; *Jewett Bros.* v. *C., M. & St. P. Ry. Co.*, 156 Fed. Rep. 160; *Kiser Co.* v. *Central of Ga. Ry. Co.*, 158 Fed. Rep. 193; *No. Pac. Ry. Co.* v. *Pacific Coast &c. Ass'n*, 165 Fed. Rep. 1; *Proctor & Gamble* v. *United States*, 225 U. S. 282; *Robinson* v. *B. & O. R. Co.*, 222 U. S. 506; *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Union Pacific R. R. Co.* v. *Oregon & Wash. Ass'n*, 165 Fed. Rep. 13; *Wickwire Steel Co.* v. *N. Y. C. & H. R. R. Co.*, 181 Fed. Rep. 316.

As to prosecutions by the United States see *Armour Packing Co.* v. *United States*, 209 U. S. 56; *A., T. & S. F. Ry. Co.* v. *United States*, 170 Fed. Rep. 250; *Chicago & Alton Ry. Co.* v. *United States*, 156 Fed. Rep. 558; *S. C.*, 212 U. S. 563; *Chicago, St. P. &c. Ry. Co.* v. *United States*, 162 Fed. Rep. 835; *C., B. & Q. Ry. Co.* v. *United States*, 209 U. S. 90; *Great Nor. Ry. Co.* v. *United States*, 208 U. S. 452; *L. V. R. R. Co.* v. *United States*, 188 Fed. Rep. 879; *N. Y. Central* v. *United States*, 212 U. S. 481, 500; *Standard Oil Co.* v. *United States*, 179 Fed. Rep. 614; *United States* v. *B. & O. R. Co.*, 153 Fed. Rep. 997; *United*

*States* v. *Great Nor. R. Co.*, 157 Fed. Rep. 288; *United
States* v. *Hocking Valley Ry. Co.*, 194 Fed. Rep. 234;
*United States* v. *Mer. & Min. &c. Co.*, 187 Fed. Rep.
363; *United States* v. *Miller*, 223 U. S. 599; *United States*
v. *P. & R. Ry. Co.*, 184 Fed Rep. 543; *United States* v.
*Sunday Creek Co.*, 194 Fed. Rep. 252; *United States* v.
*Texas & Pac.*, 185 Fed. Rep. 820; *Wight* v. *United States*,
167 U. S. 512; *Wisconsin Cent.* v. *United States*, 169
Fed. Rep. 76.

*Mr. W. H. Bogle,* with whom *Mr. Carrol B. Graves,
Mr. W. B. Stratton, Mr. Ira Bronson, Mr. Morven Thomp-
son* and *Mr. Bruce C. Shorts* were on the brief, for defend-
ants in error:

Under the provisions of the act of March 2, 1907, the
questions for review are only those arising from the de-
cision of the court below in construing the statutes upon
which the indictment is founded.

Holding that the indictment did not sufficiently specify
the acts of the individual defendants which were relied
upon as constituting a participation by them in the offense
charged, or in aiding or assisting therein is not a construc-
tion of either the conspiracy statute, upon which that
count of the indictment was founded, or of the Interstate
Commerce Act, the violation of which was the crime which
the defendants were alleged to have conspired to commit.
The ruling of the court below sustaining the demurrer as
to count 6 was based upon general principles of criminal
pleading, and is not reviewable under this writ. *United
States* v. *Keitel*, 211 U. S. 370; *United States* v. *Stevenson*,
215 U. S. 190.

Neither of the acts charged in the indictment, nor the
two combined, amounts to undue restraint of trade or
monopoly, under the Anti-trust Act, or undue discrim-
ination under the Interstate Commerce Act.

The Pacific and Arctic Railway & Navigation Com-

pany was constructed and operated from the international boundary line to Skagway. It was under no legal duty to assume any obligations whatever with respect of the carriage of either freight or passengers by water between Skagway and the southern ports. If it voluntarily assumed any obligations for carriage beyond its own line, it had the legal right at its own discretion to select the agencies beyond its own line for which it would be responsible. Under the principles of common law, it had this absolute right, and could enter into an agreement for through routing and through rating with one connecting carrier and refuse to enter into any such agreement with any other connecting carrier. *A., T. & S. F. R. Co.* v. *D. &c. Co.*, 110 U. S. 667; *S. P. R. Co.* v. *I. Com. Comm.*, 200 U. S. 536; *Interstate Com. Comm.* v. *N. P. Co.*, 216 U. S. 538; *St. Louis Drayage Co.* v. *L. & N. R. R.*, 65 Fed. Rep. 39; *O. S. L. Co.* v. *N. P. R. Co.*, 51 Fed. Rep. 465; *C. & N. W. Co.* v. *Osborne*, 52 Fed. Rep. 912; *P. & S. Co.* v. *A., T. & S. F. Co.*, 73 Fed. Rep. 438; *G., C. & S. R. Co.* v. *S. S. Co.*, 86 Fed. Rep. 407; *Central Stock Yards Co.* v. *L. & N. R. Co.*, 118 Fed. Rep. 113.

The provision in § 1 of the Commerce Act requiring carriers to establish through routes and just and reasonable rates applicable thereto, does not require a carrier to establish through routes with all connecting carriers. So long as reasonable through routes are established the obligation imposed is complied with.

This clause in § 1 standing alone, is not capable of particular enforcement, and it must be read in connection with § 15. Two carriers cannot establish a through route unless they can agree upon the terms and conditions, and upon the amount and division of the through rate. The failure of carriers to come to terms of agreement cannot be made a criminal offense under § 10 of the Commerce Act or under the Sherman Act. *Cardiff Coal Co.* v. *C., M. & St. P. R. Co.*, 13 I. C. C. Rep. 460. There

was no legal duty upon the carrier to make a through rout-
ing agreement with any particular connecting carrier, un-
til the Interstate Commerce Commission, after a hearing,
had in the first instance determined that such a through
route was required by the public interest, and ordered its
establishment. · *Interstate Com. Comm.* v. *N. P. Co.*, 216
U. S. 538.

The indictment in this case does not allege that any
particular agreement for through routing was ever pre-
sented to the railway company by any other connecting
carrier than the defendants, nor does it allege upon what
terms and conditions the railway should have contracted,
nor indicate in any way how the defendant railway com-
pany was to be protected against the additional obliga-
tions resulting from a through routing with such carrier.

It is intended by the Interstate Commerce Act that the
question, when and under what circumstances a through
route should be established between any two particular
connecting carriers (in the absence of voluntary agreement
between them), and upon what terms and conditions
such through route should be established, was committed
in the first instance exclusively to the determination of
the Interstate Commerce Commission pursuant to the
provisions of § 15 of the act; that the courts could not,
in either a civil or criminal proceeding, determine in the
first instance and in the absence of action by the Com-
mission, whether a through route as between any two
specified connecting carriers was or was not required by
the public interest; and that in the absence of any action
by the Commission, an allegation that a carrier entered
into a through routing agreement with one connecting
carrier and refused to make such agreement with any
other carrier, cannot be held to be undue discrimination
under the Commerce Act, or undue restraint of trade
under the Anti-trust Act.  *Tex. & Pac. Railway Co.* v.
*Abilene Cotton Oil Co.*, 204 U. S. 426; *B. & O. R. Co.* v.

*Pitcairn Coal Co.*, 215 U. S. 482; *Robinson* v. *B. & O. R. Co.*, 222 U. S. 506; *Proctor & Gamble Co.* v. *United States*, 225 U. S. 282.

The establishment or non-establishment of a through route in a given instance is administrative in its nature, and the determination of the necessity for its establishment is, in the first instance, committed exclusively to the judgment of the Commission by § 15 of the act.

The construction of the indictment by the court below, showing a difference in conditions under which different wharfage rates were charged, is binding upon this court. *United States* v. *Biggs*, 211 U. S. 507; *United States* v. *Patten*, 226 U. S. 525; *United States* v. *Winslow*, 227 U. S. 202.

The reasonableness of the wharfage rate on local shipments, and the reasonableness of the difference in the rate on local and on through-routed shipments, are questions for the solution of which there is no certain or fixed standard, and upon which different men might reasonably reach different conclusions. To make criminality depend, not upon facts, but upon the view of a jury as to the reasonableness of rates, is contrary to fundamental principles. *Tozier* v. *United States*, 52 Fed. Rep. 917; *Van Patten* v. *C., M. & St. P. Ry. Co.*, 81 Fed. Rep. 545.

While it is alleged that the lines from Skagway to Dawson were under one and the same management and operated as one continuous line, it is not alleged that the defendant railroad company or any of the other defendants had any interest in or control over or participated in the operation of either of the three foreign lines.

The laws of the United States cannot make it either criminal or wrongful for the owners of a foreign railroad to refuse to enter into traffic agreements with any other carrier whether located within or without the United States, and involving a carriage in such foreign country. It is not and cannot be criminal or wrongful for the

defendant railway company or its officers to refuse to
extend through-routing privileges over railroads and
steamship lines owned and operated by other corpora-
tions in a foreign country. Neither the defendants nor
the Interstate Commerce Commission itself had any
power to establish through-routing and through-rating
over these foreign lines without the consent of the owners
and operators of such foreign lines. Our laws cannot be
extended so as to control or affect foreign carriage. *Am.
Banana Co. v. United Fruit Co.*, 213 U. S. 347.

The acts charged against the defendants were lawful
at common law, and are not forbidden by the Interstate
Commerce Act; it cannot, therefore, be held that they
constitute either undue restraint of trade or undue dis-
crimination. The refusal by the railroad company to
give to the Humboldt Steamship Company, or any other
company, privileges which it was under no legal obliga-
tion to give, and to which such other company was not
legally entitled, cannot be made the basis of a charge of
either undue discrimination or undue restraint of trade.
*A. J. & F. S.* v. *Tiedt*, 196 Fed. Rep. 349; *Donovan* v.
*Pennsylvania Co.*, 199 U. S. 279; *Gamble-Robinson Co.* v.
*Railroad*, 168 Fed. Rep. 161; *G., C. & S. R. Co.* v. *Miami
Steamship Co.*, 86 Fed. Rep. 407.

With respect to counts 1 and 2, the allegations of the
indictment are too general and indefinite.

Mr. Justice McKenna, after stating the case as
above, delivered the opinion of the court.

The District Court said that it was "without jurisdic-
tion to entertain or determine the questions involved
in the first five counts of the indictment in either a crimi-
nal or civil proceeding," until the matters of discrimina-
tion between carriers or shippers or the giving or refusing
of joint traffic arrangements "have been submitted to

and passed on by the Interstate Commerce Commission." For this conclusion the court relied on *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 427, and *Baltimore & Ohio Railroad Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481, 492.

It may be well, even at the expense of repetition, to give a summary of the indictment before passing to the special contention of the parties. The route described is between ports of the United States (called southern ports) and places in northern Alaska and Canada (called northern ports)—(1) by steamship lines from the United States and Vancouver, (southern ports) to Skagway (the entire wharfage facilities being owned by The North Pacific Wharves & Trading Company); (2) thence by railroad to the headwaters of the Yukon River; (3) thence by boat down the Yukon River to Dawson, etc., (called the northern ports). The route is designated as the White Pass and Yukon Route and is constituted of (a) The Pacific and Arctic Railway and Navigation Company, a West Virginia corporation; (b) The British Columbia-Yukon Railway Company, incorporated under the laws of British Columbia; (c) The British-Yukon Railway Company, incorporated under the laws of the Dominion of Canada; and (d) The British-Yukon Navigation Company, Limited, incorporated under the laws of British Columbia. These companies are referred to as "the railroad company" and own the only line of transportation between the wharf at Skagway and the Yukon River.

By mutual agreement between the defendant steamship companies, the Wharves Company and the railroad company, through routes and joint rates were established, thus making one continuous line of common carriers for freight and passengers between the United States (southern ports) and northern Alaska (northern ports).

The Humboldt Steamship Company and other independent lines plied between the United States and Skagway.

By agreement between the defendants the railroad refused to make any through route or joint rates with the Humboldt Company, or with any of the independent steamship lines, and refused to bill freight or passengers from the United States to Yukon River points, or reversely, except by ships belonging to one of the defendant companies.

By agreement between the defendants the railroad fixed so-called local rates between Skagway and the Yukon River points, which rates were very much higher than the railroad's pro rata of the through rate.

The Wharves Company charged $2.00 a ton for freight if shipped on a vessel not owned by one of the defendant companies. If so shipped and consigned to one who had entered into, or was about to enter into a contract to have all of his shipments so carried, the wharfage charge was only $1.00. Wharfage charges in excess of $1.00 are unreasonably high.

As a result of the agreement, shippers were compelled to use only the ships of the defendant steamship companies, as in that way alone could lower through rates be obtained. Competition in water transportation was destroyed between the defendant steamship companies and the independent lines, defendants obtained a monopoly of the transportation business between the United States and Alaska, and the Humboldt Company was discriminated against in the matter of through rates. These agreements between the defendant companies are alleged to be (count 1) for the purpose of eliminating competition from the business of transportation between the United States and Alaska; (second count) to monopolize such business; (counts 3, 4 and 5) to discriminate against the Humboldt Company. Count 6 we omit from consideration for the present.

The charges of the indictment may be even further concentrated and attention directed to these elements: The

defendant steamship lines and the Humboldt and independent lines from the United States to Skagway, the wharf at Skagway and the railroad from Skagway to the Yukon River points. The only possibility of competition is in the water part of this route. This controlled, the entire transportation is controlled; and to this control the action of the defendants was directed, the means of control being an agreement between the defendants to throw all the trade into the hands of the defendant steamship companies by the railroad company establishing through route and joint rates with them and refusing to do so with the Humboldt Company or any of the independent companies. The Wharves Company gave its assent by its wharfage charges and all evasion was prevented by so fixing the local rates that their combination was greater than the through rate agreed on. It is manifest that the scheme was effective and cut out the Humboldt line and the independent lines as factors in the routes of transportation between the United States and the Yukon River points. Is the scheme illegal?

This is asserted by the Government and denied by the defendants. The court below, if we take some parts of its decisions, held that the forum of that question was the Interstate Commerce Commission. But, considering the decision of the court as a whole, we think it construed the Anti-trust Act, upon which counts 1 and 2 were based, and to those counts we shall confine our discussion for the present. This is admitted by defendants. They say that as the court held that in order to constitute restraint of trade or monopolization of trade under the Anti-trust Act the act charged must be such as at common law constituted restraint of trade, and were unlawful, to that extent the court construed the act. And, setting forth the grounds of the ruling, counsel say that the court decided that the entering into through route agreements by a common carrier with one or more connecting carriers

and the refusal to make such agreements with other connecting carriers was not unlawful either at common law or by the Interstate Commerce Act, and the court held, therefore, that such act did not constitute restraint within the meaning of the Anti-trust Act. The right of a carrier to select its connections must be admitted (we state the right as absolute, without regard to the Interstate Commerce Act, for our present purposes), and if there were nothing else in the case the conclusion of the District Court would have to be affirmed. But there is another and important element to be considered. The charge of the indictment is that the agreements were entered into not from natural trade reasons, not from a judgment of the greater efficiency or responsibility of the defendant steamship lines as instruments in the transportation than the independent lines, but as a combination and conspiracy in restraint of trade by preventing and destroying competition in the transportation of freight and passengers between the United States and Alaska and obtaining a monopoly of the traffic by engaging not to enter into agreements with the independent lines. There is a charge, therefore, of infringement of the Anti-trust Law, of something more done than the exercise of the common-law right of selecting connections, and the scheme becomes illegal. *Swift & Co.* v. *United States,* 196 U. S. 375, 396. We do not pause to justify this conclusion, either by the general purpose of the act or by its adjudged applications. Its general purpose has been elaborately set forth in very recent cases; and particular instances of its application, pertinent to the case at bar and illustrative of it, are exhibited by *Swift & Co.* v. *United States, supra,* and *Standard Sanitary Manufacturing Co.* v. *United States,* 226 U. S. 20. In those cases, as here, rights were brought forward to justify a purpose which transcended the limits put upon their exercise by the Anti-trust Act. In those cases, as here, the purpose (the

means being different) was the prevention or destruction of competition, and the agreements here are exactly adapted to the purpose. Not the railroad only but the Wharves Company as well is charged to be in the combination. It was intermediate the railroad and the steamship lines and discriminated in its wharfage charge, it is alleged, to aid in the purpose of the combination, and, to complete and make effective the purpose, the local rates from Skagway to Yukon points were made greater than that part of the through transportation.

Whether $2.00 per ton (the rate charged to independent lines as against $1.00 per ton charged to the defendant steamship lines) was reasonable or unreasonable, or whether a through rate may be less than the sum of the local rates, we are not called upon to consider, although the court below thought the inquiry important and the defendants make it prominent in their contentions. The plan makes the parts unlawful (*Swift & Co.* v. *United States, supra*), whatever they may be independently of it, and whether there is or is not a standard of reasonableness which juries may apply is aside from the question. It is equally unimportant to consider whether the Interstate Commerce Commission has power to pass on the rates, as such, or through routing, as such. We are dealing with an indictment which charges a criminal violation of the Anti-trust Act, and of that the criminal courts have cognizance, with power of decision upon the principle which we have expressed.

The next contention of defendants is that as part of the transportation route was outside of the United States the Anti-trust Law does not apply. The consequences and, indeed, legal impossibility are set forth to such application, and, it is said, "make it obvious that our laws relating to *interstate* and *foreign* commerce were not intended to have any effect upon the carriage by foreign roads in foreign countries, and . . . it is equally clear that

our laws cannot be extended so as to control or affect, the foreign carriage." This is but saying that laws have no extra-territorial operation; but to apply the proposition as defendants apply it would put the transportation route described in the indictment out of the control of either Canada or the United States. These consequences we cannot accept. The indictment alleges that the four companies which constitute the White Pass & Yukon Route (referred to as the railroad) and owned and controlled by the same persons, entered into the combination and conspiracy alleged, with the intention alleged, with the Wharves Company and the defendant steamship companies. In other words, it was a control to be exercised over transportation in the United States, and, so far, is within the jurisdiction of the laws of the United States, criminal and civil. If we may not control foreign citizens or corporations operating in foreign territory, we certainly may control such citizens and corporations operating in our territory, as we undoubtedly may control our own citizens and our own corporations.

The ruling of the District Court, sustaining the demurrer to the first and second counts, was therefore erroneous.

The decision of the District Court upon counts 3, 4 and 5 must be determined upon different principles than those which we have just expressed in passing on counts 1 and 2. The District Court, as we have seen, decided that the conduct of the defendants was not subject to judicial review in a criminal or civil case until it had been submitted to and passed upon by the Interstate Commerce Commission. The Government attacks the conclusion with arguments of great strength and contends that it makes the Commission not only the judges of the civil relief that private shippers may be given against the carriers by the Interstate Commerce Act, but gives the Commission the control and practical determination of

the criminal provisions of the law.   The argument, in effect, is that the conclusion of the District Court confounds the civil and criminal remedies of the law, the private injury and the public injury, resulting from the violation of its provisions.   And who, it is asked, will initiate the criminal proceeding and by what proof will it be supported?   What degree of proof is to be accorded to the finding of the Commission—presumptive or conclusive?   If neither, it is argued, "it would be a senseless thing to regard such a finding as a condition precedent of the United States to indict."   If, it is asked further, the finding of the Commission is to have either *prima facie* or conclusive effect, against whom is it to have such effect?   If against a defendant, what becomes of the Sixth Amendment of the Constitution?.   The argument of the Government is cast in a series of questions which end in the final answer, as it is contended, that under the decision of the District Court the Interstate Commerce Commission "becomes practically the court of final criminal jurisdiction."

The contentions of the Government would be formidable indeed if the Interstate Commerce Act was entirely criminal.   But it is more regulatory and administrative than criminal.   It has, it is true, a criminal provision against violations of its requirements, but some of its requirements may well depend upon the exercise of the administrative power of the Commission.   This view avoids the consequences depicted by the Government. It keeps separate the civil and criminal remedies of the act, each to be exercised in its proper circumstances. It makes the Interstate Commerce Act what it was intended to be and defined to be in the cases cited by the District Court, to-wit: *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.* and *Baltimore & Ohio Railroad Co.* v. *Pitcairn Coal Co., supra.*   And it would in our judgment be an erroneous view to take that the great problems which

the act was intended to solve and the great purposes it was intended to effect should be considered of less consequence than the facility which should be given to some particular remedy, civil or criminal. We need not extend the discussion. The purpose of the Interstate Commerce Act to establish a tribunal to determine the relation of communities, shippers and carriers and their respective rights and obligations dependent upon the act has been demonstrated by the cited cases, and also the sufficiency of its powers to deal with the circumstances set forth in the indictment.

The District Court sustained count 6, against the demurrer of the corporate defendants, but held its averments were not sufficient to connect the individual defendants with the offense charged. This is a construction of the indictment and not subject to review.

It is urged by the individual defendants that the objection is applicable to the other counts of the indictment and that the court would have undoubtedly so ruled but for its construction of the Anti-trust Act, and it is also urged that in case of reversal of the court's decision upon the construction of the act it be permitted to pass upon such of the grounds of demurrer as were not passed upon in the former ruling. We yield to the request, and the more readily as the Government does not express great confidence in the sufficiency of the indictment. Its final contention is that the judgment of the District Court be reversed, with instructions "to pass on the sufficiency of the indictment without regard to the action or non-action of the Interstate Commerce Commission."

*The judgment is therefore reversed as to counts 1 and 2 and the case remanded with instructions to proceed in accordance with this opinion.*