**UNITED STATES of America,**
**Plaintiff,**

v.

**R. P. OLDHAM COMPANY, Winter Wolff & Co., Inc., Thos. D. Stevenson & Sons, Inc., Balfour, Guthrie & Co., Limited, John P. Herber & Company, Inc., Kinoshita and Co., Ltd., U.S.A., R. P. Oldham, Jr., Al Perrish, and William L. McGee, Defendants.**

**No. 35567.**

United States District Court
N. D. California, S. D.
June 11, 1957.

Lyle L. Jones, Anti-Trust Division, San Francisco, Cal., for plaintiff.

Carl Schuck, Los Angeles, Cal., for defendants R. P. Oldham & Co. and R. P. Oldham, Jr.

Macklin Fleming, Los Angeles, Cal., for defendants Winter, Wolff & Co. and Al Perrish.

Frank McCarthy, San Francisco, Cal., for defendants Thos. D. Stevenson & Sons and Wm. L. McGee.

Walker Lowry, San Francisco, Cal., for defendant Balfour-Guthrie & Co.

Joseph L. Alioto, San Francisco, Cal., for defendant John P. Herber & Co.

H. Wm. Tanaka, Washington, D. C., and Salvatore Fusco, San Francisco, Cal., for defendant Kinoshita & Co.

EDWARD P. MURPHY, District Judge.

This is a criminal action charging a conspiracy in restraint of interstate and foreign commerce in Japanese wire nails, in violation of Section 1 of the Sherman Act[1] and Section 73 of the Wilson Tariff Act.[2] Brought together as defendants are five United States corporations which import Japanese wire nails for resale on the West Coast of the United States, three officers of these corporations, and an American subsidiary of a Japanese corporation which exports wire nails to the United States. In addition, a number of Japanese firms are named as co-conspirators but not joined as defendants.

Briefly, the facts alleged in the indictment are these. Although there are over 200 Japanese nail makers, the wire rod used in the manufacture of these nails is made by only five Japanese rod mak-

1. 15 U.S.C.A. § 1.

2. 15 U.S.C.A. Sec. 8.

ers. With respect to wire nails to be sold on the West Coast of the United States, the defendant importers have engaged in a conspiracy with the five Japanese rod makers and certain Japanese exporters whereby the rod makers have furnished wire rod to nail makers only for the manufacture of nails to be sold and shipped through the co-conspirator exporters and to the defendant importers; the defendant importers in turn have purchased a designated amount of nails and have resold them in allocated sales territories at designated prices. The results of the conspiracy are that the defendant importers have acquired complete control of the Japanese wire nail market on the West Coast, all other importers, as well as direct purchasers, have been excluded from this market, competition in the sale of wire nails on the West Coast has been eliminated, and prices at which the nails are sold on the West Coast have been stabilized.

Various motions are before this court, and there are many duplications. For purposes of discussion, each motion will be deemed to have been made by all defendants unless otherwise noted.

I. Relationship of the Sherman Act and the Wilson Tariff Act

■ It is contended that Count One of the indictment, charging a violation of Section 1 of the Sherman Act, must be dismissed in view of Count Two, which charges a violation of Section 73 of the Wilson Tariff Act. The ground urged for this dismissal is that Section 73 of the Wilson Tariff Act applies the prohibitions of the Sherman Act to import trade and therefore, being the more specific statute, it must be held to have superseded the Sherman Act with regard to import trade.

This motion merits no discussion. It is well settled that both acts can be applied to restraints on import trade.

**3.** Even if the Japanese co-conspirators had been joined as defendants, this would not in itself be cause for dismissal of the indictment. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416;

United States v. General Electric Co., D.C.S.D.N.Y.1948, 80 F.Supp. 989, 1016–1017; United States v. General Dyestuff Corp., D.C.S.D.N.Y.1944, 57 F.Supp. 642, 648; cf. United States v. Sisal Sales Corp., 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042. Accordingly, the motion to dismiss Count One of the indictment is denied. The alternative motion to require election between the two counts of the indictment is also denied.

II. Jurisdiction

■ Relying mainly on American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, the defendants strongly urge that the indictment reaches too far, that all or part of the alleged conspiracy and acts in furtherance of the conspiracy are beyond this court's jurisdiction, or at least that Japanese law controls in determining the legality of these activities.

At the outset, it should be made clear that there is no attempt here to regulate Japanese commerce as such, or to indict Japanese firms or Japanese nationals.[3] Only American corporations and American nationals are named as defendants. The only commerce sought to be regulated is the importation and sale of wire nails on the West Coast of the United States. Surely this is within the jurisdiction of United States courts. Japanese firms and activities in Japan are considered only in so far as they relate to the precise charge, against American defendants, of a conspiracy in restraint of trade in the importation and sale of wire nails on the West Coast of the United States. Under the circumstances, it is absurd to say that principles of international law and comity of nations put the charges of this indictment within the exclusive jurisdiction of the Japanese courts, or require that Japanese law be applied.

United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L. Ed. 663; United States v. Pacific & Arctic Railway & Navigation Co., 1913, 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742.

■ There seems to be some disagreement as to where the alleged conspiracy was formed. But assuming, arguendo, that the conspiracy at least "has its situs" in Japan and that most acts in furtherance of the conspiracy have been done in Japan, this does not deprive the court of jurisdiction where, as here, the conspiracy is alleged to operate as a direct and substantial restraint on interstate and foreign commerce of the United States. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416; United States v. Timken Roller Bearing Co., D.C.N.D.Ohio 1949, 83 F. Supp. 284, modified and affirmed, 1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199.

■ Nor does the fact that the agreement may be lawful in Japan serve to make it lawful in this country. United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. Defendants also press the point that if the situation were reversed—i. e., if the agreement concerned exportation of American products to Japan—the agreement would be under the aegis of the Webb-Pomerene Act.[4] Suffice it to say that the situation is not reversed.

■ Much is made of the fact that this is a criminal action. A criminal statute of course must be construed more strictly than a civil statute. But it requires no stretching of the Sherman Act to apply it to the facts of this case. The Supreme Court had no difficulty in similarly applying the Sherman Act in United States v. American Tobacco Co., supra, and United States v. Pacific & Arctic Railway & Navigation Co., 1913, 228 U. S. 87, 33 S.Ct. 443, 57 L.Ed. 742, both criminal actions.

As to American Banana Co. v. United Fruit Co., supra, to the extent that the case still has vigor in anti-trust actions, the facts in the instant action are far closer to those in United States v. Sisal Sales Corp., supra, where it was held that the American Banana case did not apply.

■ One further point raised by the defendants in support of their motion goes to the evidentiary problems which will come up at trial because of the inclusion of these foreign elements in the indictment. But evidentiary difficulties do not divest a court of jurisdiction. As to the argument that the defendants should not be put to an explanation of the acts of their foreign co-conspirators, it should not be forgotten that the government will have the burden of proof in this action.

For the foregoing reasons, the motion to dismiss the indictment for lack of jurisdiction is denied.

III.   Effect of the Treaty

In 1953 the United States and Japan entered into a Treaty of Friendship, Commerce and Navigation. The effect of the Treaty is to accord "national treatment" and "most favored nation treatment" by one party to nationals of the other party (I use the term "nationals" to include companies as well as individuals). In other words, nationals of one party are not to be discriminated against by the other party.

Article XVIII of the Treaty states:

"1. The two Parties agree that business practices which restrain competition, limit access to markets or foster monopolistic control, and which are engaged in or made effective by one or more private or public commercial enterprises or by combination, agreement or other arrangement among such enterprises, may have harmful effects upon commerce between their respective territories. Accordingly, each Party agrees upon the request of the other Party to consult with respect to any such practices and to take such measures as it deems appropriate with a view to eliminating such harmful effects.

"2. * * * * ”

It is contended by the defendants that Article XVIII provides the exclusive remedy available to the government in reach-

4.  15 U.S.C.A. §§ 61–65.

ing the conspiracy charged in the indictment.

■ I cannot agree that Article XVIII was intended to provide any such exclusive remedy. The language of this Article is permissive rather than mandatory. If it had been intended that the Article should operate as a pro tanto revocation of the anti-trust laws, the Article could easily have been so worded. The tenor of the entire Treaty is *equal* treatment to nationals of the other party, not *better* treatment. In view of these considerations, I conclude that Article XVIII was intended to supplement the anti-trust laws, not replace them.

■ Even if Article XVIII were held to provide an exclusive remedy for anti-trust violations, the defendant importers would have no standing to invoke this Article. All are American corporations. Certainly the Treaty was not intended to exempt nationals from the sanctions of their own country's laws. Cf. Skiriotes v. State of Florida, 1941, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193.

■ Nor do I think Kinoshita & Co., Ltd., U. S. A., would have any standing to invoke Article XVIII. Though wholly owned by a Japanese corporation, the defendant Kinoshita is an American corporation organized under the laws of California. Article XXII of the Treaty is the only article devoted to definition of terms used in the Treaty. After defining "national treatment" and "most fa-

vored nation treatment" in paragraphs 1 and 2, respectively, Article XXII goes on in paragraph 3 to define "companies", and then states:

" * * * Companies constituted under the applicable laws and regulations within the territories of either Party *shall be deemed companies thereof* and shall have their juridical status recognized within the territories of the other Party. (Emphasis added.)

"4. * * * "

Thus by the terms of the Treaty itself, as well as by established principles of law, a corporation organized under the laws of a given jurisdiction is a creature of that jurisdiction, with no greater rights, privileges or immunities than any other corporation of that jurisdiction.[5]

If con-conspirator Kinoshita & Co., Ltd., Tokyo had wished to retain its status as a Japanese corporation while doing business in this country, it could easily have operated through a branch. Having chosen instead to gain privileges accorded American corporations by operating through an American subsidiary, it has for most purposes surrendered its Japanese identity with respect to the activities of this subsidiary.

Article VII of the Treaty in no way weakens the above conclusion.[6] Although it equates domestic subsidiaries with their foreign parents, it does so only for purposes of that Article, which

---

5. But of course, the rights of an alien owned corporation may be *less* than those of domestically owned corporations. See Clark v. Uebersee Finanz-Korporation, A. G., 1947, 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88; Daimler Co. v. Continental Tyre & Rubber Co., (1916) A.C. 307 (H.L.)

6. The pertinent provisions of Article VII read: "1. Nationals and companies of either Party shall be accorded national treatment with respect to engaging in all types of commercial, industrial, financial and other business activities within the territories of the other Party, whether directly or by agent or through the medium of any form of lawful juridical entity. Accordingly, such nationals and

companies shall be permitted within such territories: (a) to establish and maintain branches, agencies, offices, factories and other establishments appropriate to the conduct of their business; (b) to organize companies under the general company laws of such other Party, and to acquire majority interests in companies of such other Party; and (c) to control and manage enterprises which they have established or acquired. Moreover, enterprises which they control, whether in the form of individual proprietorships, companies or otherwise, shall, in all that relates to the conduct of the activities thereof, be accorded treatment no less favorable than that accorded like enterprises controlled by nationals and companies of such other Party."

has the effect of according nationals of one party engaging in business within the territory of the other party the same treatment accorded nationals of the other party. For example, an American subsidiary of a Japanese parent is to have the same rights as any domestically owned American corporation. The Article nowhere attempts to give greater rights to such subsidiaries.

The motion to dismiss the indictment on the basis of the Treaty of Friendship, Commerce and Navigation between the United States and Japan is therefore denied.

## IV. Motion to Strike

As an alternative to dismissing the indictment for lack of jurisdiction, there is a motion pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to strike as surplusage those allegations in the indictment which relate to the activities of the Japanese co-conspirators. A motion to strike allegations of an indictment as surplusage should not be granted unless it is clear that the allegations are not relevant and are prejudicial or inflammatory. United States v. Klein, D.C.S.D. N.Y.1954, 124 F.Supp. 476, 479–480. Here the allegations which the defendants ask this court to strike are relevant facts relating to the formation of the conspiracy, acts done pursuant to the conspiracy, and the effects of the conspiracy in the United States. Accordingly, the motion to strike is denied.

## V. Balfour, Guthrie & Co., Ltd.

In addition to concurring in most of the above motions, defendant Balfour, Guthrie & Co., Ltd., has moved for dismissal on the ground that it did not sign a proposed agreement for distribution of Japanese wire nails in the United States and on the further ground, as stated in a supporting affidavit, that its purchase of Japanese wire nails has been on an order-by-order basis and that it has "shopped around" for the best price. This position may be well taken. But without any evidence before it, without any elaboration of the government's

general and broad indictment, at best it would be premature for this court to say that Balfour, Guthrie & Co. should be dropped as a defendant. Therefore, this motion is denied, without prejudice to renew the motion at a later stage of the proceedings.

## VI. Bill of Particulars

Essentially, there are two motions for bills of particulars. The motions of the following defendants are identical and will be considered as one motion: R. P. Oldham Co., Winter Wolff & Co., Inc.; R. P. Oldham, Jr.; Al Perrish; Thos. D. Stevenson & Sons, Inc.; and William L. McGee. The motion of Kinoshita & Co., Ltd., U. S. A., will be considered separately.

Because of the complexities of this case—particularly in its foreign aspect— and the generality of the allegations in the indictment, I feel that a bill of particulars is necessary here to enable the defendants properly to prepare their case and avoid surprise at trial.

Motions of R. P. Oldham Co. et al. The section numbers referred to here will be those used in the collective motion of defendants R. P. Oldham Co., Winter Wolff & Co., Inc., R. P. Oldham, Jr., and Al Perrish. The corresponding section numbers used in the joint motion of defendants Thos. D. Stevenson & Sons, Inc., and William L. McGee shall be deemed ruled on in the same manner.

The following requests seek to ascertain the precise nature of the charges against the defendants, and are granted: Paragraphs I–IV, inclusive; V(a); VI– X, inclusive.

The remaining requests—Paragraph V(b), (c) and (d)—would require too great a disclosure of evidence on the government's part, and the defendants will be adequately apprised of the specific charges against them by the granting of the other requests. Accordingly, they are denied.

Motion of Kinoshita & Co., Ltd., U. S. A. The following requests, or portions thereof, relate to the theory of the gov-

ernment's case with respect to defendant Kinoshita & Co., Ltd., U. S. A., particularly the extent to which the government claims this defendant is responsible for, or in identity with, co-conspirators Kinoshita & Co., Ltd., Tokyo and Shigeru Kinoshita: Paragraphs I–III, inclusive; IV, with the exception of "and by what means" in each of subparagraphs (a), (b) and (c); V and VI; VII, with the exception of "and by what means" in each of subparagraphs (a), (b) and (c). These requests are granted.

Those portions of the requests which have not been granted above are denied. These particular portions relate too heavily to the government's evidence, and their denial will not substantially impair defendant Kinoshita in preparation of its case nor result in surprise at trial.

### Order

All motions to dismiss and strike are denied. The motions for bills of particulars are granted to the extent stated in Section VI, supra, and are otherwise denied.

It is so ordered.