**UNITED STATES v. ASSOCIATION OF AMERICAN RAILROADS et al.**

Civil Action No. 246.

District Court, D. Nebraska,
Lincoln Division.

Sept. 27, 1945.

Francis Biddle, Atty. Gen., Wendell Berg, Asst. Atty. Gen., Arne C. Wiprud, William L. McGovern, James E. Kilday, Gerald A. Herrick, Samuel Karp, Robert M. Hunter, Albert Boggess, W. B. Watson Snyder, and David O. Mathews, Sp. Assts. to Atty. Gen., Sylvester E. Hevers, Sp. Atty., of Washington, D. C., and Joseph T. Votava, U. S. Atty., of Omaha, Neb., for plaintiff.

William Dwight Whitney (of Cravath, Swaine & Moore), of New York City, and William I. Aitken (of Woods, Aitken & Aitken), of Lincoln, Neb., for defendant Kuhn, Loeb & Co.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City, and Guy C. Chambers, of Lincoln, Neb., for defendants Thomas W. Lamont and J. P. Morgan & Co., Inc.

R. V. Fletcher, August G. Gutheim, and Charles D. Drayton, all of Washington, D. C., Earl Cline and Maxwell V. Beghtol, both of Lincoln, Neb., T. F. Hamer, of Omaha, Neb., and Douglas F. Smith, of Chicago, Ill., for all defendants except those above named and Frederick E. Williamson and Robert C. Vaughan.

DELEHANT, District Judge.

To facilitate an orderly understanding of the objectives of the several motions before the court, a very brief statement of the contents of the complaint should be made, without any pretense, however, to thoroughness or adequacy in its formulation. A comprehensive analysis of that pleading would unreasonably expand this memorandum without any practical ministry to its purpose, and will not be formally

undertaken in the announcement of this ruling. The body of the complaint comprises some forty-nine paragraphs, many of which are in several subdivisions; and covers forty typewritten pages, exclusive of eleven pages devoted to the presentation of an exhibit.

The United States of America, proceeding under Section 4 of the Act of July 2, 1890, C. 647, 26 Stat. 209, 15 U.S.C.A. § 1 et seq. (commonly known as the Sherman Anti-Trust Act), for alleged violations of Sections 1 and 2 of the Act, brings this proceeding against a large number of defendants, including generally, (a) those corporations (and the trustees of certain designated corporations in judicial custody) operating nearly all of the railroads in the Western District of the United States, which is defined as all states West of the Mississippi river and, for some purposes, Illinois and parts of Wisconsin and Michigan, and owning and operating the railroads entering from the Western District into the rail traffic gateways of Chicago and St. Louis where traffic proceeding from or to the Western District is interchanged with eastern and southern carriers; (b) The Association of American Railroads and The Western Association of Railway Executives, voluntary agencies erected and maintained, the former by the corporate operators of all, or substantially all, of the major railroads in the United States, the latter by the corporate operators of nearly all of the railroads in the Western District; (c) J. P. Morgan and Company, Incorporated, and Kuhn, Loeb and Company, two New York banking corporations that allegedly control and handle substantially all financing and security transactions of the defendant railroad corporations as well as of other corporations operating the major railroad lines in the eastern and southern portions of the United States, and also have substantial financial interests in many other large industries in the eastern part of the nation; and (d) sundry individuals holding responsible directorial or official positions with several of the designated corporate defendants, incident to which, they are said to represent such corporations upon the controlling board or boards of one or more of the voluntary associations identified as defendants, and of an allegedly actually persisting, though ostensibly dissolved and abandoned, "commissioner plan" under a former so-called "Western Agreement" for the voluntary direction and supervision in certain particulars and in their mutual interests, of the railroads in the Western District.

Counsel, both in pleadings and in briefs, have referred to The Association of American Railroads as "AAR" and to Western Association of Railway Executives as "WARE." The same abbreviations will be resorted to in this memorandum.

The complaint alleges that, beginning at some time before 1932 and continuing until its filing, the defendants, (a) have been (and that they are as of the time of such filing) engaged in an unlawful combination and conspiracy in restraint of trade and commerce in the interstate transportation of freight and passengers, and were and are parties to contracts, agreements, arrangements and understandings in restraint of such trade and commerce in violation of Section 1 of the Sherman Act; and (b) have monopolized, attempted to monopolize and conspired and combined to monopolize a substantial part of such trade and commerce in violation of Section 2 of the Act; and that they threaten to persist in that conduct.

It asserts as specific purposes and practices, of the alleged combination and conspiracy, and conspiratorial monopoly, both effected and attempted, the following, among other features: The imposition on shippers in the Western District of freight rates higher than those charged for comparable services in the Eastern, or so-called "Official" District; the interception of the initiation by western railroads of competitive freight rates or passenger fares without the approval of the defendants and some unnamed coconspirators in the Eastern District; the fixing of rates for transporting petroleum and petroleum products at noncompetitive levels; the prevention of the construction and introduction of sundry designated advantageous facilities for western shippers; the deprivation of western shipping customers of competitive transportation services and rates; the impairment of transportation services for western shippers by the arbitrary obstruction of connections and retarding of shipments, especially of perishable products destined to eastern points; the exaction from western shippers of certain unwarranted assessorial charges; the denial to shippers from the Western District of advantageous rates and transit privileges, obtainable but for the combination; the prevention or deferment of the installation for

the benefit of western shippers and passengers of certain expedited service and improved equipment, and facilities and recreational opportunities for travelers; the restriction of solicitation of business by individual railroads; the determination of freight rates and passenger fares in the Western District and the effective prevention of the reduction of either of such charges; and the prevention and postponement of the development of competitive modes of transportation and travel, notably by motor trucks and motor busses. The complaint sets out several illustrative examples of alleged conspiratorial collusion, furthered in some instances by coercive repression of individual conspiring carriers, in the maintenance at an unjustifiably high level of rates for the shipment of freight from, to or within the Western District; in the thwarting of competitive solicitation of low rate passenger traffic; in the exaction from shippers, and notably the plaintiff itself as a shipper of war materials, of extortionate and noncompetitive rates maintained by and in consequence of the combination and conspiracy; and in the artificial and improper manipulation of pipe line and rail rates for petroleum through conspiratory and repressive means.

It is alleged that among the actual and designed results of the combination and conspiracy have been the elimination of competition in transportation rates and services between transportation agencies serving the Western District; the suppression of development in competitive methods of transport, such as highway motor vehicles, airplanes, and pipelines; the impairment of industrial development within the district; the diminution and restraint of its trade and commerce; the hindering of its growth in population; the curtailment of the purchasing power of its people; and the depression of the national economy.

The principal instrumentalities to which resort has allegedly been had to effectuate the asserted unlawful program are said to include the defendants AAR and WARE and a voluntary arrangement known as the "Commissioner Plan, Western District" under the so-called Western Agreement, a written undertaking between many railroads severally subscribing to it, whose averred terms are set out in the only exhibit attached to the complaint. Without detailed particularity, the court observes that the complaint charges that, through these, as well as other, agencies, the de-

fendant railroad and banking corporations, acting by their representatives on the governing boards of the agencies, have accomplished a conspiratorial and coercive policing of the trade restraining and monopolistic objectives of the members of the combination, and an effective control over their practices, facilities, services and rates. While the complaint recognizes the purported formal cancellation of the Western Agreement as of April 23, 1943, it avers that the practices pursued under it have not been abandoned but are still continued by the defendants in furtherance of the alleged conspiracy.

The complaint also asserts that the defendants have promoted their unlawful design by fostering litigation in courts and before boards, and by supporting repressive legislative measures in a general effort to delay or hamper, within and for the Western District, the advent and growth of competitive transportation methods. It also sets out certain alleged devices by which the defendants have achieved the installation of noncompetitive rate structures under arrangements with pipeline operators and oil companies.

The plaintiff prays for a decree adjudging the alleged conspiracy and combination and the understandings and agreements in furtherance thereof to be unlawfully violative of Sections 1 and 2 of the Sherman Act; granting injunctive relief under the Act; dissolving AAR and WARE and enjoining the defendants from the erection of, or participation in, like organizations for the asserted unlawful purposes and from reviving or reinstating the so-called commissioner plan, or other device or devices employed under the Western Agreement, or any similar plan with like objective; and for general relief.

Separate motions directed against the complaint have been presented, one by the defendant Kuhn, Loeb & Co.; another by the defendants Thomas W. Lamont and J. P. Morgan & Co. Incorporated, of which, allegedly the defendant Thomas W. Lamont is a director and chairman of the board; and a third by all of the remaining defendants except Frederick E. Williamson and Robert C. Vaughan, on neither of whom the process of the court appears to have been served. Although many defendants unite in the motion last identified, they ostensibly move "separately and severally."

The several motions neither acknowledge nor betray a common origin. They

approach their individual objectives somewhat differently, and each in its own language. Nevertheless, they are all designed to achieve the same general purpose. Each of them asks primarily, that the complaint be wholly dismissed; and, only alternatively and in the event of the denial of its initial request, (a) that certain parts of the complaint (identified variously but with a community of underlying thought) be stricken or dismissed; and (b) that a Bill of Particulars be required of the plaintiff in respect of much the greater part, both in number and in scope, of the essential allegations of the complaint. It is upon those motions in their several phases that the ruling now announced is made.

The court gratefully acknowledges its indebtedness to counsel for the contending parties by reason of their assistance in its labors, through their comprehensive and orderly briefs and their conspicuously able oral arguments. This service on their part has been exceptionally notable and merits recognition and mention. However, the court must not be equally exhaustive in its discussion of its determination of the several motions. An entire volume would barely suffice for that purpose; and express discussion will accordingly be tendered only upon the salient aspects of the motions. Especially will this be true, to the extent that they demand bills of particulars.

Moreover, the magnitude of the action's objectives, the prominence and national significance of the parties defendant, and the industry and learning of counsel expended in the instant submission may not be allowed to obscure the acknowledged fact that the basic issues of law thus far involved in the case are comparatively simple, and the court's action in respect of them is directed with relative clarity by the trend of recent decisions in the application of the pertinent rules of procedure.

The first demand of all moving defendants is for the dismissal of the action in its entirety. Whether by design or through inadvertence, the motion of the defendants Lamont and J. P. Morgan & Co. asserts as a ground for dismissal, without further specification, that the complaint fails to state a claim upon which relief can be granted. In the other two motions the same general assignment is made, but with the limiting specification of Section 12 of Public Law No. 603 of the 77th Congress, 50 U.S.C.A.Appendix Section 1112, and Certificate No. 44 issued thereunder by the Chairman of the War Production Board on March 20, 1943, 8 F.R., p. 3804, as the exact basis of infirmity in the statement of claim. The same statute and certificate are likewise cited in all three motions in support of a challenge to the court's present jurisdiction of the subject matter of the action and also in denial of the plaintiff's capacity to sue.

In the interest of clarity, the court now announces very briefly its disposition of the motions for dismissal on the grounds of want of jurisdiction of this court over the subject matter of the action and the plaintiff's lack of capacity to sue. They are not well taken, and quite obviously involve a misapprehension of the scope of motions of that sort in the field of preliminary pleading.

■ A plaintiff's "legal capacity to sue" is to be distinguished from his possession of a "cause of action." They are quite different things. The law recognizes "capacity to sue" as the plaintiff's personal right to come into court, and his "cause of action" as his right to relief under the facts of the case he brings. Kittinger v. Churchill Evangelistic Association, 230 App.Div. 253, 267 N.Y.S. 719; Jones v. R. Young Brothers Lumber Co., 180 Misc. 565, 45 N. Y.S.2d 308; Ward v. Petrie, 157 N.Y. 301, 51 N.E. 1002, 68 Am.St.Rep. 790; Klopstock v. Superior Court, 17 Cal.2d 13, 108 P.2d 906, 135 A.L.R. 318; Braden v. Neal, 132 Kan. 387, 295 P. 678; Howell v. Iola Portland Cement Co., 86 Kan. 450, 121 P. 346; Bailey v. Parry Mfg. Co., 159 Okl. 152, 158 P. 561; Withers v. Rockland Mines Co., 58 Nev. 98, 71 P.2d 156, 112 A. L.R. 1506. Thus understood, there is no possible question of the plaintiff's capacity to sue. It is expressly recognized by 15 U.S.C.A. § 4.

■ Somewhat similarly, a court's want of "jurisdiction of subject matter" deals with generality, not with particularity. By "subject matter," in that context, is meant the abstract thing, the general class, not the particular case. More exactly, it is the authority of a court to exercise judicial power over the class of cases or proceedings to which the specific case belongs. It, too, is not synonymous with, but is to be distinguished from, "cause of action", which has to do with the individual facts of a specific case. Cooper v. Reynolds, 10 Wall. 308, 19 L.Ed. 931; United States v.

518

New York & O. S. S. Co., Ltd., 2 Cir., 216 F. 61; Ex parte Craig, 2 Cir., 282 F. 138; Pocahontas Mining Co. v. Industrial Commission, 301 Ill. 462, 134 N.E. 160; · Ashlock v. Ashlock, 360 Ill. 115, 195 N.E. 657; Musick v. Kansas City S. & M. R. Co., 114 Mo. 309, 21 S.W. 491; Glacken v. Andrew, 69 Okl. 61, 169 P. 1096; Malone v. Meres, 91 Fla. 709, 109 So. 677; Richards v. Richards, 87 Misc. 134, 149 N.Y.S. 1028; State v. Wolever, 127 Ind. 306, 26 N.E. 762; Melton v. Jenkins, 50 Ga.App. 615, 178 S.E. 754; Fooks' Executors v. Ghingher, 172 Md. 612, 192 A. 782; Reed v. Muscatine, 104 Iowa 183, 73 N.W. 579; Peyton v. Peyton, 28 Wash. 278, 68 P. 757. Beyond question, the jurisdiction of this court over the subject matter of this action is expressly conferred by the statute, 15 U.S.C.A. § 4.

But the disposition of those aspects of the motions to dismiss leaves for consideration their determination upon their pertinent assignment, under Rule 12(b) (6), 28 U.S.C.A. following section 723c, of failure to state a claim upon which relief can be granted.

The general assignment by the Lamont-Morgan & Co. motion of failure to state a claim upon which relief can be granted has not been explicitly withdrawn either in the brief of the moving parties or upon oral argument. However, it has not been fortified by discussion and may be considered not to be relied upon, from the circumstance that in the brief of the assigning parties their motion to dismiss is grounded solely upon the cited Section 12 and Certificate 44. But from the immediately ensuing discussion, it will be obvious that in the court's estimation, Section 12 and Certificate 44 aside, the allegations of the complaint would constitute the basis of a claim supporting allowable relief under the Sherman Act.

In the application of Rule 12(b) (6), Federal Rules of Civil Procedure, 28 U.S.C.A., following Section 723c, to motions to dismiss complaints for failure to state claims upon which relief can be granted, judicial opinion has confirmed the view that such a motion should not be granted "if it is conceivable that, under the allegations of his complaint, a plaintiff can, upon a trial, establish a case which would entitle him to the relief prayed for." This rule has been asserted repeatedly in the eighth judicial circuit. Sparks v. England, 8 Cir., 113 F.2d 579, 582; Leimer v. State Mutual Life Assurance Co., 8 Cir., 103 F.2d 302; Cohen v. United States,

8 Cir., 129 F.2d 733; Louisiana Farmers' Protective Union v. Great A. & P. Tea Co., 8 Cir., 131 F.2d 419; Musteen v. Johnson, 8 Cir., 113 F.2d 106; Cool v. International Shoe Co., 8 Cir., 142 F.2d 318. See also, Tahir Erk v. Glen L. Martin Co., 4 Cir., 116 F.2d 865. The motion, for the sole purpose of its consideration, admits the properly pleaded factual allegations of the complaint, together with those inferences and legal conclusions reasonably issuing therefrom which are favorable to the plaintiff. And the ruling upon the motion's prayer is to be formulated from the allegations of the complaint, even though those allegations be wholly or partially denied in the motion or other pleading of the moving party. Polk Company v. Glover, 305 U.S. 5, 59 S.Ct. 15, 83 L.Ed. 6; Cooper v. O'Connor, 71 App. D.C. 6, 107 F.2d 207. The plaintiff is not taken by the submission against him of a motion to dismiss to have consented to the determination of controverted questions of fact averred in the complaint in a summary manner or otherwise than upon a formal trial. There is a logical parity in this respect between motions to dismiss for failure to state a claim and motions for summary judgment. See Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318, in which upon a demand for a summary judgment the necessity of a final trial upon the merits was affirmed, notwithstanding the filing of substantially persuasive affidavits assailing the accuracy of material averments of the complaint. See also Walling v. Reid, 8 Cir., 139 F.2d 323. Equally applicable to the determination of motions to dismiss and to those for summary judgments is the observation of Mr. Justice Brandeis in Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 51, 52, 58 S.Ct. 459, 464, 82 L.Ed. 638, that, "lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact."

Accordingly, upon the motions to dismiss, the court's initial inquiry is whether, considered in the reasonable light most favorable to the plaintiff, the complaint may conceivably warrant the introduction of evidence supporting a decree in favor of the plaintiff. And the present motions to dismiss must be denied, (a) if without resting on any of the practices within the protection of 50 U.S.C.A.Appendix § 1112 and

Certificate No. 44 issued thereunder, the complaint states a claim supporting relief; or, if, in its entirety it states a valid claim and either (b) the complaint alleges conduct by the defendants which, if proved, would deny to them the protection of the statute and certificate just cited; or (c) either 50 U.S.C.A.Appendix § 1112 or Certificate No. 44 issued thereunder is invalid. The last of these three alternatives may be disregarded, for, thus far at least, the plaintiff does not assert the invalidity either of the statute or of the certificate. The power of the Congress, by which the Sherman Act was adopted, to make exceptions from its provisions, or to suspend its operations within prescribed limitations, either temporarily or permanently, is not actually assailed and has been exercised on several occasions. Some examples of such action are 15 U.S.C.A. § 78(n) (The Securities Exchange Act of 1934); 15 U.S.C.A. §§ 832(d) and 842 (Bituminous Coal Act of 1937, replacing Bituminous Coal Conservation Act of 1935); 7 U.S.C.A. § 671(d) (Agricultural Marketing Act). See United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263. Discussion of the distinctions in respect of, and limitations upon, this power of exemption or absolution is not presently in order, since the power itself is acknowledged and the manner of its exercise in the present instance is unchallenged.

Title 50 U.S.C.A.Appendix § 1112 is Section 12 of the "Small Business Mobilization Act," approved June 11, 1942. It will be referred to hereafter as Section 12. It was enacted in aid of the then vigorously current and now abating, though still operative, war effort. Its text follows:

"Whenever the Chairman of the War Production Board shall, after consultation with the Attorney General, find, and so certify to the Attorney General in writing, that the doing of any act or thing, or the omission to do any act or thing, by one or more persons during the period that this section is in effect, in compliance with any request or approval made by the Chairman in writing, is requisite to the prosecution of the war, such act, thing or omission shall be deemed in the public interest and no prosecution or civil action shall be commenced with reference thereto under the antitrust laws of the United States or the Federal Trade Commission

Act. Such finding and certificate may in his discretion be withdrawn at any time by the Chairman by giving notice of such withdrawal to the Attorney General, whereupon the provisions of this section shall not apply to any subsequent act or omission by reason of such finding or certificate.

"The Attorney General from time to time, but not less frequently than once every one hundred and twenty days, shall transmit to the Congress a report of operations under this section. Reports provided for under this section shall be transmitted to the Secretary of the Senate or the Clerk of the House of Representatives, as the case may be, if the Senate or the House of Representatives, as the case may be, is not in session.

"The Attorney General shall order published in the Federal Register every such certificate and, when he deems it in the public interest, the details of any plan, program or other arrangement promulgated under, or which is the basis of, any such certificate.

"This section shall remain in force until six months after the termination of the present war on until such earlier time as the Congress by concurrent resolution or the President may designate, but no prosecution or civil action shall be commenced thereafter with reference to any act or omission occurring prior thereto if such prosecution or civil action would be barred by this section if it remained in force."

The court observes the significant language by which the Congress there declared the protected activities, otherwise either dubiously licit or admittedly unlawful, to be "in the public interest" during the section's life, and imperatively forbade any prosecution or civil action in respect of any of them, even to be instituted. To the extent that this section is, or at any time may become, decisively operative in the pending suit, the implications of that mandatory phraseology will not be neglected. However, the primary question presently is respecting its pertinence to the case rather than its consequence to the suit if its pertinence be affirmed.

In furtherance of that section, and after consultation with the Attorney General, the Chairman of the War Production Board, on March 20, 1943, issued Certificate No. 44 in the following language:

"The Attorney General: Pursuant to the provisions of section 12 of Public Law No. 603, 77th Congress (56 Stat. 357), I hereby approve joint action by common carriers or freight forwarders, or their respective representatives, through rate bureaus, rate conferences, or other similar carrier or forwarder organizations, in the initiation and establishment of common carrier and freight forwarder rates, fares, and charges, and carrier and forwarder regulations and practices pertaining thereto: Provided, That such action is taken subject to and in compliance with certain regulations for rate conferences formulated by the Interstate Commerce Commission a copy of which is hereunto annexed and made a part hereof; and after consultation with you, I hereby find and so certify to you that the doing of any act or thing, or the omission to do any act or thing, by any person in compliance with my approval herein expressed, is requisite to the prosecution of the war.

"Donald M. Nelson,<br>"Chairman.

"March 20, 1943."

The "regulations for rate conferences" incorporated by reference into the certificate and published therewith (see 8 Fed.Reg., pp. 3804, 3805) include, among others, the following rules:

"Rule 1. Definitions as used in those rules. (a) The term 'rate conference' means any two or more common carriers or any two or more freight forwarders who consult together, either directly or by employees or representatives, for the purpose of considering or agreeing upon rates to be charged by them, or of providing for the publication of tariffs containing such rates."

"(c) The term 'rates' includes fares, charges, and classifications, and all rules, regulations, and practices affecting the charges made for the transportation of freight or passengers and services incidental to such transportation."

"(d) The term 'carrier' means a common carrier or a freight forwarder."

"Rule 3. On or before April 15, 1943, each rate conference shall register with the Interstate Commerce Commission and shall file with the Commission a copy of its by-laws, the names and addresses of its officers and of the members of rate and other committees (except special or sub-committees created for temporary functioning), the rules of procedure followed by it, a copy of any agreement or other document which in any way provides for, governs, or affects such procedure, and schedules of its charges to members or, where expenses are divided among the members, statements showing how the expenses are divided; and, if a corporation, a copy of its articles of incorporation. A copy of each change in any of the above shall be filed within 30 days of the effective date of the change."

"Rule 8. No boycott or other means of coercion or intimidation shall be employed by a rate conference, directly or indirectly, to restrain a carrier, either a member or a non-member, from taking independent action consistent with these rules, to establish rates other than those approved by a rate conference."

"Rule 10. These rules are subject to modification, change, and addition as the need therefor may be shown."

They also include rules, (a) according to each member of a rate conference the right to propose to the conference the initiation of, or changes in, rates by itself or other members of the conference, and (b) forbidding the prohibition by conference rule or practice of the publication of a rate by a member in its behalf after a prescribed interval following its proposal to the conference.

Several affidavits were filed in support of the motion to dismiss, tendered by the greater number of the defendants.

One of the affidavits, besides emphasizing the magnitude of the transportation operations of the defendant railroad corporations, states that since April 15, 1943 (the registration date prescribed in Rule 3, supra), those railroad operators, together with other railroad operators, have maintained in the Western District some twenty-seven designated and identified organizations registered as rate conferences, among which are included AAR, and, until its alleged cancellation on April 23, 1943, the "Agreement for Commissioner Plan, Western District," all of which, during that entire period, have been registered as rate conferences under Rule 3, supra; and, in the initiation and establishment of rates, fares, charges, and carrier regulations and practices have maintained and employed no rate bureaus or rate-making associations, established by agreements between and

among themselves, not so registered. This affidavit is accompanied by sundry other affidavits, one by a responsible officer or agent of each of the designated bureaus or organizations asserting in the case of each of them, its seasonable registration under Rule 3, supra, as a "rate conference," and that it "then complied, and at all times thereafter has complied, in all respects, with said certificate and regulations and with each and all of the conditions, requirements and rules set forth in said certificate and regulations, has observed and obeyed the same, and since its said registration as aforesaid, all joint action, if any, taken by or through said organization in the initiation and establishment of common carrier rates, fares, and charges and carrier regulations and practices pertaining thereto, has been taken subject to and in compliance with said certificate and regulations." The quoted language is identical in most of the supporting affidavits, and its essential thought is embodied in those of them in which there is any verbal variation.

Now, the obvious and professed purpose of those affidavits is to satisfy the court that, since the effective date of Certificate 44 through the time of filing the plaintiff's complaint and down to the dates of the affidavits, all of the conduct of the defendants challenged in the complaint has been in the nature of "joint action by common carriers or freight forwarders, or their respective representatives, through rate bureaus, rate conferences, or other similar carrier or forwarder organizations, etc.," which, in Certificate 44, was approved, with the further certificate that action or forebearance thereunder is requisite to the prosecution of the war; and, therefore, at the inception of this suit was, and still is, within the sweeping protection of Section 12.

The moving defendants argue that, since the plaintiff, after obtaining judicial permission and allowance of time within which, at its election, to file counter affidavits, did not make such filing, their own affidavits must be conclusively taken as true and the action of the court proceed on that assumption. The motions are now being considered in the light of their charge under Rule 12(b) (6). So regarded, this court, though acknowledging the existence of a disparity of legal opinion upon the point, considers that the weight of authority generally in the federal courts, the

clear attitude of the Circuit Court of Appeals for the Eighth Judicial Circuit (vide supra), and the better reasoning conspire in the denial to a defendant of the right to impeach, by affidavits in support of a motion to dismiss for failure to state a valid claim, the essential allegations of a complaint and thereby in effect to force the plaintiff into a summary trial, even without the necessity of answer, upon matters of fact explicitly averred in the complaint. Yudin v. Carroll, D.C:Ark., 57 F.Supp. 793, 794, 795; Moore's Federal Practice, Vol. 1, pp. 646, 647 and supplemental pocket parts, with analysis of cases cited; see also cases already cited upon the general point of the matter to be considered under such a motion. McNutt v. General Motors Acceptance Corporation, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135, and KVOS, Inc., v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183, principally relied upon in this connection by the defendants, are not in point in the present submission, not because they were determined prior to the operation of the present rules of practice, though that is true, but because they merely announce the familiar rule that when in a case where jurisdiction rests upon diversity of citizenship and the jurisdictional amount, jurisdiction of the court in the instant case, rather than of the subject matter of the action is challenged, the court before proceeding to any judgment on the merits must require the party claiming jurisdiction to sustain it by proof. In the McNutt case the challenge was by answer; in the KVOS case by motion to dismiss, but incident to a pending prayer for preliminary injunction heard concurrently with the motion to dismiss. And in both instances proof of the jurisdictional amount was a burden of the moving party prerequisite to consideration of its case upon the pending merits. Without unnecessary citations, the several Eighth Circuit Court cases relied upon for the same purpose are similarly distinguishable.

What the defendants undertook to do by their affidavits was essentially to traverse, more exactly to narrow by explanation, the material allegations of the complaint. Such denials, however tendered, are to be tried in the usual formal way.

The defendants, to be sure, argue that their affidavits are especially to be considered in support of their assertion of the court's want of jurisdiction of the subject

matter of the action. But it need not be repeated that they go to the merits of the instant case only, and are not responsive to the issue of jurisdiction of the general subject matter of the action.

In the light of the immediately foregoing observations, a critical analysis of the probative consequence of the affidavits is unnecessary and may well be regarded as presumptuous. It may nevertheless be remarked without further discussion, (a) that it does not necessarily follow from them that all of the rate bureaus or conferences referred to in the general language of the complaint are named and purged in the affidavits, (b) that they do not show that all criticised activities of AAR are within the appropriate and temporarily immunized functions of such bureaus, and (c) that, within the reasoning of Walling v. Fairmont Creamery Company, supra, certain of their averments are legal conclusions of the affiants.

 Under Certificate 44 the "joint action" approved by the Chairman of the War Production Board, and consequently protected by Section 12, is not any and every action in the rate field taken in concert by those engaged in transportation, but only that taken "through rate bureaus, rate conferences, or other similar carrier or forwarder organizations" registered under Rule 3, supra. It must be obvious that Section 12 as implemented by Certificate 44 affords no immunity to conspiratorial, or otherwise unlawful concerted, action in the field under examination, if it be taken otherwise than within a registered bureau or conference. Such outside action is indeed "joint action" but it is not either approved by the certificate or immunized for the time being by Section 12.

Nor can it be seriously contended that all phases of the combined and conspiratory action set out in the complaint necessarily occurred within the scope of rate bureaus or conferences, whether those identified in the affidavits as duly registered or others comparable in kind and purpose. That the complaint itself compels a contrary conclusion must be apparent from the recollection of the brief and only partial analysis of it already set out.

It deals with asserted illegal activity in respect of several matters other than "rates," even under the very inclusive definition of Rule 1(c), quoted above. It attacks the erection, purposes, operations and activities of WARE which is not claimed by any party hereto to be a registered rate bureau or association. It sets out in detail the assertedly unlawful activities of the defendants through the abandoned "Commissioner Plan, Western District" and charges that despite the formal termination of the agreement for the "plan" the defendants still persist in its program and practices; and if that be true, surely the registration of the plan, followed in eight days by its ostensible cancellation, could not immunize illicit action taken by the adherents to the plan in accordance with its design but not through the registered "plan" which had ceased to have any acknowledged or actual existence.

The opposing parties are not in agreement as to whether, or how far, the plaintiff alleges in its complaint, and relies for its claim to relief, upon joint action of the defendants through rate bureaus or conferences, to sustain its statement of a claim. For example, the plaintiff argues that, "the complaint does not name rate bureaus as defendants; nor are they any where identified by name." Literally speaking, that statement is accurate. But, without their formal characterization by name, the petition does clearly refer to "certain western rate bureaus and rate-making associations established by agreements between and among defendant railroads," as some of the agencies utilized by the alleged combination and conspiracy to effect their unlawful purpose. And it seems equally obvious that rate bureaus, along perhaps with other instrumentalities, are within the meaning of the epithets "private rate-making machinery", "this existing machinery" and the like, occasionally resorted to in the complaint.

The moving defendants, on the other hand, insist that the only "joint action" in the challenged field at which the complaint is aimed is that taken by some of the defendants through formally organized rate bureaus or rate conferences. Apart from their attempt to establish that contention by affidavits, already declared by the court to be inadequate, they endeavor to sustain their position by extended argument founded chiefly upon several items. Basically, they point out a public position, adhered to quite consistently through several years by the Antitrust Division in the United States Department of Justice with a substantial continuity of personnel, to the effect that joint and noncompetitive action in the matter of rates, fares and services by carriers in the defendants'

position through rate bureaus or conferences is, in itself and of its own force, a violation of the Sherman Act. It is very clear from the appearances of counsel in the complaint that the Antitrust Division sponsors the present action. The briefs of the defendants discuss at length a grand jury inquiry, into rate bureau practices directed by the Antitrust Division and only briefly antedating the enactment of Section 12, which was concluded without the final quest of indictments, out of regard for the probable impact of indictments of that character upon the carriers' war activities. The position of the Department of Justice in the history of the enactment of Section 12 is set out. Emphasis is placed upon the abundantly documented efforts of the Department of Justice and its Antitrust Division to intercept the issuance of Certificate 44; and upon several statements especially by members of the Antitrust Division, both in the course of the preliminary consideration of Certificate 44 and in hearings before the United States Senate Committee on Interstate Commerce in the Seventy-eighth Congress upon S. 942, commencing on May 18, 1943. The defendants point to those statements as disclosing a then current opinion, on the part of the men writing and speaking, to the effect that, under Section 12, Certificate 44 "was simply a perpetuation, a validation of every single thing we were fighting against," namely, joint and noncompetitive action respecting rates, fares, and services, by carriers through rate bureaus. That factual history is offered by the defendants to disclose that the central object of the assault by the plaintiff, under the spur of the Antitrust Division Department of Justice, is, as it consistently has been, the rate bureau or conference instrumentality; and, equally, that while Certificate 44 was in the making and for some time after its issuance, men responsible for the administration of the Antitrust Division and of the Department of Justice itself considered, and quite publicly declared, that Certificate 44 was operative for the duration of its effective period to immunize from suit or prosecution, and confer a legislative benediction upon, such action.

The court is not at all interested in the appraisal by members of the Department of Justice of Certificate 44 on the occasion of or shortly after its issuance. Whatever their opinion may have been, it may conceivably have been something less than perfectly objective, and even quite mistak-

en. The court is, or at least eventually will be, under the necessity of considering that effect upon its merits in the light of the facts in issue as they may hereafter develop, and particularly of considering the certificate in the light of such construction of it as has been or may be given and announced by competent and controlling judicial authority, especially by the Supreme Court of the United States. Vide infra.

And, interesting as the cited history may be, it is inadequate in the court's opinion to limit the present complaint to an attack upon the rate bureau or conference technique as such, or even to empty it of all of its content beyond the assertion of the perversion of rate bureaus to the illicit purposes of a broad underlying conspiracy. Upon this point the defendants argue that the conspiracy charged against them is "conjured up and articulated" so that it may "stand out in front of the rate fixing conspiracy and be outside of the immunity of Certificate 44." And that argument has received the careful study and consideration of the court. It is conceivable that, upon the final trial on its merits of this action, the contention just adverted to may develop from the evidence to be true; that, despite the comprehensive allegations of the complaint, the charge of an underlying conspiracy and combination of the character set out may fail of proof, and the plaintiff's case under the testimony be narrowed down to an attack on the rate bureau or conference practice, as intrinsically and necessarily violative of the Sherman Act. In that eventuality the court will readily meet the issue thus presented, and also and as its preliminary step, determine whether such a suit may be tolerated if it be commenced in defiance of the prohibition of Section 12 and during its operative period. Counsel for the defendants may possibly be fortified for their able and earnest argument upon the point, by an intimate knowledge of what the facts are and the testimony must be, and may know with certainty that their hypothesis will be vindicated upon the trial.

But the court can not now be in that position. Upon this important point, for its present purposes, it must accept the allegations of the complaint as they are made. And, doing so, it considers that even without reference to the employmnt of rate bureaus and conferences, the complaint avers an actionable conspiracy, combina-

tion, monopoly and attempt to monopolize, under the Sherman Act.

Both the briefs and the oral arguments of the defendants challenge the good faith of the Antitrust Division, Department of Justice, in the initiation of this proceeding. Not even the gentle euphemisms of advocacy can eliminate that connotation from their exhaustive analysis of the division's long declared position upon the rate conference issue and their repeated characterization of the suit as the "flouting" and "ignoring" of Certificate 44. But, unless a factual situation defeats the right of a plaintiff to sue, the courts are not usually concerned about his motives in bringing a permissible action. So, here, considering that the complaint's claim may conceivably support relief, the court does not inquire into the ethics or the patriotism of its filing. Those are matters within the responsibility and determination of the administrative authority. In the American system, the judiciary is not the keeper of the conscience either of the executive department or of the legislative branch of the government. Nor is it clothed with visitorial power over either of its coordinate units of the federal structure.

It need hardly be observed, and is not questioned by the defendants, that, notwithstanding the important statutory function in the determination of interstate railroad charges, rates, fares, services and practices, of the Interstate Commerce Commission, the Sherman Act applies to interstate common carriers by rail as well as by other means. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Joint Traffic Association, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259; Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679, affirming 8 Cir., 120 F. 721; United States v. Union Pacific Railroad Company, 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124; United States v. Pacific & Arctic Railway & Navigation Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; United States v. Southern Pacific Company, 259 U.S. 214, 42 S.Ct. 496, 66 L.Ed. 907; State of Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 65 S.Ct. 716. That coverage granted, it seems clear to the court that, even without relying upon action through instrumentalities within the current protection of Section 12 and Certificate 44, the complaint alleges a claim sufficient to support the allowance of relief. Omitting discussion or citation of authority, it may simply be said that its charges, whose general outline has already been sketched, follow the reasonably consistent pattern of accusations under the Antitrust Act sustained in the numerous reported cases. And this is strikingly clear in respect of State of Georgia v. Pennsylvania Railroad Co., supra.

Then, it is considered that the complaint does assert, and in part rely upon, the defendants' employment, not in good faith but rather for the purposes of the conspiracy and combination, of rate bureaus and conferences and their services. The defendants insist that, however maliciously or corruptly such bureaus or conferences may be utilized by or for the carriers, that use may not lend vigor or validity to an action of this nature commenced during the effective period of Section 12 and Certificate 44. And their argument undoubtedly contends also that such use, while the section and certificate are in force, is immunized for all time, and may not be relied upon to sustain or fortify a suit instituted after the act shall have lapsed. The latter point can not now be before the court, and no opinion upon it is intimated. The former point is hereafter considered briefly in the course of the ruling upon the motions to strike; and that consideration may be given attention also for its relevance to the existence in the complaint of allegations of conduct which, if proved, would deny the defendants the protection of Section 12 and Certificate 44. But it may be mentioned before proceeding further that in view of the recent opinion of the Supreme Court in State of Georgia v. Pennsylvania Railroad Co., cited elsewhere herein, the court does not consider that allegations of that import are wholly without significance in deciding, under the motions to dismiss, whether the complaint states a valid claim.

Some specific arguments against the validity of the complaint will now be noted briefly.

It is said by the defendants that the plaintiff's charge of coercion must fall in the face of its overriding accusation of conspiracy; that a conspirator can not, within the scope of the conspiracy, be the victim of coercion or repression. That position involves an oversimplification of the technique of conspiracy. It is quite notorious that one of the most effective methods of perpetuating a conspiracy once set

afoot, and fostering its purpose, is coercion, of some of its own less hardy, self seeking, or even repentant members.

The contention is presented that the pending suit is a single and indivisible action, and that, in the face of Section 12 and Certificate 44, it must be dismissed in its entirety because of the prohibition of the institution of such a suit if it involves, even in part, operations in respect of rates through registered rate bureaus. The court, however, can not conceive that, in the face of the recognized rule that congressional exemption from the operation of the Sherman Act is not to be amplified beyond the reasonable intendment of its language, action in furtherance of a denounced conspiracy and combination, taken without resort to registered rate bureaus, is to be protected under the certificate by the circumstance that the same conspiracy and combination utilize for their purposes the temporarily approved services of such bureaus.

Undoubtedly, there is virtue in the defendants' argument that, if the pending action was instituted in defiance of the flat prohibition of Section 12, no development of history during its pendency may be allowed to give it validity. The principal development within the contemplation of that argument would be the termination, pendente lite, of the period of immunity, consequent on the legal end of the war, or on executive or legislative designation within the language of Section 12 itself. But that issue begs the question of the illegal institution of the suit, which, on the record thus far made, the court is unable to grant.

Upon the basis of the foregoing discussion and after careful consideration of all of the arguments made upon the issues presented, the motions to dismiss are being overruled and denied.

Alternatively and separately, the motions demand that certain material be stricken from the complaint. In reliance upon Section 12 and Certificate 44, all of them seek the striking of "each and every part of the complaint which is directed against joint action by common carriers or freight forwarders or their respective representatives, through rate bureaus, rate conferences, or other similar carrier or forwarder organizations, in the initiation and establishment of common carrier and freight forwarder rates, fares, and charges,

and carrier and forwarder regulations and practices pertaining thereto." That is the exact language of the Kuhn, Loeb & Co. designation, and, of course, it is a copy of the definition of protective coverage in and under Certificate 44. The Lamont-J. P. Morgan & Co. motion, clearly aiming at the same result, asks that the entire complaint be stricken. And the motion of the other defendants, after asking essentially the relief sought in the Kuhn, Loeb & Co. motion, though in slightly different language, particularizes but without limitation, as to many individual words, sentences, phrases and paragraphs of the complaint conceived by the moving parties to be within the protective coverage of the certificate. In passing, it may be observed that, in the court's estimation, not all of the material thus specified is necessarily or even probably within the certificate's definition; but the ruling on the motion is premised not on any relatively minor departure, but rather on the broader issue of the necessity of excluding from the complaint averments of specific fact, granting their coverage by the language of the certificate.

Against the background of the court's announced ruling that the complaint states a claim upon which relief may be granted, because its allegations are not limited to action through rate bureaus or conferences, this phase of the motions presents for determination the question whether action within the definition of Certificate 44, if it be taken, along with other measures beyond the immunity, in furtherance of a broad underlying conspiracy and combination, long antedating the certificate but still persisting, must be wholly disregarded and eliminated from consideration in a suit to end the illegal conspiracy and combination.

When this action was instituted and the motions were filed, that question was a completely open one, resting upon the language of Section 12 and Certificate 44, unaffected by any expression of judicial opinion. But during the course of the preparation of the briefs upon the motions, the opinions in State of Georgia v. Pennsylvania Railroad Company, 324 U.S. 439, 65 S.Ct. 716, 727, were delivered. While that case was not instituted by the United States, its object and the basic averments on which it is grounded are so strikingly comparable to those of the complaint before this court that the action in it of the Supreme Court

is compellingly persuasive, if not absolutely controlling in the present instance.

In a footnote to the prevailing opinion in the Georgia case, touching the point now under consideration the following comment is made:

"We have considered the argument that Certificate No. 44, issued March 20, 1943 under § 12 of the Act of June 11, 1942, 56 Stat. 357, 50 U.S.C.A.Appendix § 1112, by the Chairman of the War Production Board (8 Fed.Reg. 3804) protects this alleged combination from the charges contained in the bill. That certificate approves joint action by common carriers through rate bureaus and the like in the initiation and establishment of rates. We do not stop to analyze it beyond observing that in no respect would it be a bar to the present action. It does not purport to be retroactive. It does not sanction the use of coercion. It does not authorize any combination to discriminate against a region in the establishment of rates. Moreover, legal means may be employed for an illegal end."

This language is positive and unequivocal, and, unless some deterring reason to the contrary exists, directs the action of this court upon the question under immediate consideration.

It was said in argument that in the Georgia case, the pertinence of Certificate 44 and Section 12 was not adequately presented to the Supreme Court, in fact, was only casually drawn to its attention. But from the context of the footnote it appears affirmatively that there was argument upon the point and that the court considered that argument and announced its conclusion respecting it. In oral argument here criticism was made of the phrase, "we do not stop to analyze." But the writer of the prevailing opinion in the Supreme Court expressly declared that the question had been "considered" by the court. So the analysis that was passed by was not the Supreme Court's study of the problem, but rather the publication of any of its processes beyond its bare conclusion. Counsel for the defendants argue that the meaning of the quoted comment is uncertain in several particulars. The implications of the sentence, "It does not purport to be retroactive," in the context of the Georgia complaint's averments and prayer, and in application to this action are admittedly obscure. But, for the present, the writer hereof will consider the obscurity to lurk rather in his appraisal of the language than

in its intrinsic expression. The Supreme Court's negative answer to the argument of the certificate's inflexible protection is not uncertain. And its reasons appear to be pertinent here. An antecedent conspiracy and combination, the use of coercion, discrimination against a region in the establishment of rates, and the employment of the qualifiedly and temporarily immunized means for an illegal end are all alleged in this case.

The brevity of the footnote, and the manner of its expression inevitably prompt the argument that it is obiter dictum. But it may not properly be so characterized. It is the deliverance of the majority of the court unchallenged by the minority, upon an issue involved in the alleged facts, and argued to, and considered by, the deciding tribunal, not a mere gratuitous observation, en passant, of the writer of an opinion. And therein lies the distinction between decision (or in some instances judicial dictum) on the one hand, and mere obiter dictum, on the other. Jacksonville P. & M. R. Co. v. Schutte, 103 U.S. 118, 26 L.Ed. 327; Union Pacific R. Co. v. Mason City & Ft. Dodge R. Co., 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134; Watson v. St. Louis, I. M. & S. R. Co., C.C.Ark., 169 P. 942, 945, affirmed 223 U.S. 745, 32 S.Ct. 533, 56 L.Ed. 639; Kessler v. Armstrong Cork Co., 2 Cir., 156 F. 744; New York Cent. & H. R. R. Co. v. Price, 1 Cir., 159 F. 330, 16 L.R.A., N.S., 1103; Brown v. Chicago & Northwestern Ry. Co., 102 Wis. 137, 78 N.W. 771, 772, 44 L.R.A. 579; Scovill Mfg. Co. v. Cassidy, 275 Ill. 462, 114 N.E. 181, Ann.Cas. 1918E, 602; Chase v. American Cartage Co., 176 Wis. 235, 186 N.W. 598; Spitzley v. Garrison, 208 Mich. 50, 175 N.W. 390; State v. Loveless, Nev., 150 P.2d 1015. And even if this court were persuaded that the comment of the Supreme Court was dictum, it would approach reluctantly the conclusion that it might becomingly or prudently disregard or reject that dictum. This court will not understandingly or presumptuously set its individual opinion above the considered expression upon a controverted issue, of its acknowledged judicial superiors, however summarily or obliquely it may be published.

The quoted statement in the Georgia case is followed in the present ruling. And the court will not venture to intimate what conclusion upon the question it might have reached without that expression. The motions to strike, to the extent that they have

been stated thus far, are being overruled and denied.

■ The defendants Lamont and J. P. Morgan & Co. further move that allegations in paragraph 12(16), and 31, be stricken as immaterial, redundant, impertinent and scandalous, and, in the case of paragraph 31, inadequate to state a claim supporting relief. Briefly stated, they set out the relationship of Lamont to the Morgan Corporation, his representation of it on a committee utilized by the conspiracy and generally in the operations of the combination, the scope of the railroad financing and eastern business operations of the Morgan and Kuhn, Loeb Corporations, and their collaboration through their own representatives with their alleged coconspirators in the projects of the combination and conspiracy. But, if the charges made be true, they are not subject to any of the infirmities suggested in respect of them. Participation by the banks in the combination and conspiracy is directly charged, and their financial operations and eastern business interests may be considered as providing them with the opportunity and motive to adhere to the scheme. That request is being denied.

■ The defendants, other than the bankers, seek by motion to eliminate from the complaint the allegations of paragraph 39 wherein they are charged with furthering their illicit objectives, among other ways, by intervening and participating, through a subordinate body or committee of WARE, in legal proceedings before public boards and commissions, by fostering the enactment of state laws restrictive upon competitive methods of transportation and, in general terms, by supporting financially and otherwise measures in opposition to the efforts of motor carriers to furnish low cost transportation and in support of the elevation of motor carrier rates to the level of railroad rates. It is true, as they contend, that, separately and abstractly considered, activities of that character are within the lawful right of every citizen and the protection of the first amendment to the constitution of the United States. But, when they are done in concert to further the designs of a conspiracy and combination denounced by express statute, they lose their detached character and become tainted with the illegality of their objective. It is another example of using a means lawful in itself for an unlawful purpose.

State of Georgia v. Pennsylvania Railroad Co., supra; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L. Ed 852; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129; Louisiana Farmers' Protective Union v. Great A. & P. Tea Co., 8 Cir., 131 F.2d 419; American Tobacco Co. v. United States, 6 Cir., 147 F.2d 93. This motion, too, is being denied and overruled.

■ Both in general terms, and with careful particularity, those defendants also move that all allegations of the complaint designed to charge a monopoly, attempt to monopolize, or combination or conspiracy to monopolize under 15 U.S.C.A. § 2, be stricken, upon the ground that they are "so vague, indefinite, uncertain, ambiguous, and equivocal that they fail in their entirety to state a claim under said Section 2 on which relief can be granted," and that they are in consequence immaterial, redundant and impertinent. Those allegations have been carefully examined in the light of many reported decisions in cases founded on Section 2, and it is considered that, at this point in the pleading they are adequate, and immune to such a motion. Ruling is being made accordingly.

■ Finally, the same defendants demand the striking, as immaterial, irrelevant, and impertinent, of certain allegations of the complaint setting out the historical truth that, in the promotional period of railroading, the predecessors of some of the defendants were the recipients of land grants and grants in aid of money and securities both from the plaintiff and from sundry states in the Western District. This court does not presently perceive the pertinence of such matter to the ultimate issues in the action, except perhaps by way of argument respecting the public character of the franchise of railroad operation and the consistent continuity of the determination of Congress to encourage, foster and promote competition in the field of transportation and to discourage and punish its suppression. It is noted, however, that Mr. Justice Peckham adverted to the circumstances alleged in his reasoning in the prevailing opinion in the early case of United States v. Trans-Missouri Freight Association, 166 U.S. 290, 332, 333, 17 S.Ct. 540,

41 L.Ed. 1007. Their presence in the complaint can serve no evil purpose; and the motion in respect of them is being denied.

The motions for bills of particulars remain. They are three in number and are respectively united alternatively with the three separate motions thus far discussed.

It will not be amiss to recall some of the considerations by which courts in the federal judicial system are now guided in their rulings upon such motions. Here, especially, a departure has been made in the current Federal Rules of Civil Procedure from the practice that formerly prevailed in all state courts, and is still administered in most of them; and also, though in less striking measure, from that contemplated under the earlier Federal Equity Rules, 28 U.S.C.A. § 723 Appendix. To a failure adequately to appraise, or a reluctance to acquiesce in, that departure, or both in combination, may be attributed a great many motions for more definite statements or bills of particulars with which our courts are confronted.

■■■■ A motion by a defendant before answer for a bill of particulars is addressed to the sound discretion of the court. Walling v. Fairmont Creamery Company, 8 Cir., 139 F.2d 318, 321; Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., D.C.Ark., 31 F. Supp. 483, 489; McKenna v. United States Lines, D.C.N.Y., 26 F.Supp. 558, 560; Bowles v. Schultz, D.C.N.H., 54 F.Supp. 708, 709; Courteau v. Interlake Steamship Co., D.C.Mich., 1 F.R.D. 429, 430; Walling v. Bay State Dredging & Contracting Co., D.C.Mass., 3 F.R.D. 241; Holland v. Gurnsey, D.C.N.H., 3 F.R.D. 239. Even without the guidance of the rules governing civil procedure, judicial discretion is to determine whether bills of particulars shall be allowed for the clarification of indictments in criminal prosecutions. Pines v. United States, 8 Cir., 123 F.2d 825, 827; Rose v. United States, 10 Cir., 128 F.2d 622, 625; Chadwick v. United States, 5 Cir., 117 F.2d 902, 903; United States v. Empire Hat & Cap Mfg. Co., D.C.Pa., 47 F.Supp. 395, 401. Such discretion was also controlling in the civil practice in the federal courts, before it received the added sanction of the present liberal rules of pleading. Harper v. Harper, 4 Cir., 252 F. 39, 41; Alaska Steamship Company v. Katzeek, 9 Cir., 16 F.2d 210. A ruling upon such a motion is so far within the discretion of the court that it will not be disturbed or re-versed upon appeal in the absence of a clear abuse of power or discretion. Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318, 321; Pines v. United States, 8 Cir., 123 F.2d 825, 827; Harper v. Harper, 4 Cir., 252 F. 39, 41; Alaska Steamship Company v. Katzeek, 9 Cir., 16 F.2d 210. The discretion thus favored is not caprice or the arbitrary exercise of authority, but rather a mature judicial discretion, resting in a rational understanding of the elemental governing principles of law and an impartial appraisal of the objectives of the pleading under scrutiny.

■■■■ The office of a bill of particulars is related to pleading, not to trial; and that distinction has contributed substantially to the course of judicial decision in the application of Rule 12(e). Its influence is somewhat more readily discernible in recent opinions than in those delivered during the earlier months of the operation of the present system of practice in the federal district courts.

■■■■ Accordingly, it is uniformly understood that a bill of particulars will not ordinarily be granted upon motion unless its allowance is reasonably necessary to enable the moving party to prepare his responsive pleading, and then only to the extent that is required for that purpose. United States v. Schine Chain Theatres, D. C.N.Y., 1 F.R.D. 205; Gum, Inc., v. Gumakers of America, D.C.Pa., 1 F.R.D. 586; Battin Amusement Co. v. Cocalis Amusement Co., D.C.N.J., 1 F.R.D. 769; Madsen v. Palmer, D.C.N.Y., 2 F.R.D. 13; Poole v. White, D.C.W.Va., 2 F.R.D. 40; Seaboard Midland Petroleum Corp. v. Socony Vacuum Oil Co., D.C.N.Y., 2 F.R.D. 150; Conmar Products Co. v. Tibony, D.C.N.Y., 2 F.R.D. 169; Klug v. Palmer, D.C.N.Y., 2 F.R.D. 273; Mitchell v. Brown, D.C. Neb., 2 F.R.D. 325; Remick Music Co. v. Interstate Hotel Co., D.C.Neb., 2 F.R.D. 510; United States v. General Motors Corp., D.C.Ill., 2 F.R.D. 346; United States v. Petrosky, D.C.Mich., 2 F.R.D. 422; Simmons Co. v. Cantor, D.C.Pa., 3 F.R.D. 281; Makan Amusement Corp. v. Trenton-New Brunswick Theatres Co., D.C.N.J., 3 F.R.D. 429; Sun Valley Mfg. Co. v. Mylish, D.C.Pa., 4 F.R.D. 170; Raudenbush v. Baltimore & Ohio R. Co., D.C.Pa., 4 F.R.D. 171; Parker v. Transcontinental & Western Air, Inc., D.C.Mo., 4 F.R.D. 325; Walling v. American Steamship Co., D.C.N.Y., 4 F.R.D. 355; American LaFrance-Foamite Corp. v. American Oil Co.,

D.C.Mass., 25 F.Supp. 386; Tully v. Howard, D.C.N.Y., 27 F.Supp. 6; Brinley v. Lewis, D.C.Pa., 27 F.Supp. 313; Moog v. Warner Brothers Pictures, Inc., D.C.N.Y., 29 F.Supp. 479; Coca-Cola Co. v. Marbert Products, Inc., D.C.N.Y., 29 F.Supp. 898; Louisiana Farmers Protective Union v. Great Atlantic & Pacific Tea Co., D.C.Ark., 31 F.Supp. 483; D. L. Stern Agency v. Mutual Benefit Health & Accident Ass'n, D.C.N.Y., 43 F.Supp. 167; Walling v. Black Diamond Coal Co., D.C.Ky., 59 F. Supp. 348.

■ Notwithstanding the language of the rule under which a bill of particulars may be sought, "of any matter which is not averred with sufficient definiteness or particularity to enable (the moving party) to prepare his responsive pleading *or to prepare for trial,*" (Emphasis Added), it has been held with comparative uniformity, and of late invariably, that the emphasized phrase adds nothing to its predecessor, "to prepare his responsive pleading." Some published opinions declare that the expression, "or to prepare for trial" is mere surplusage; others, perhaps more accurately, reason that during the period in litigation allocated to pleading, "preparation for trial" is limited to the formulation of pleadings. United States v. Schine Chain Theatres, D.C.N.Y., 1 F.R.D. 205; Courteau v. Interlake Steamship Co., D.C. Mich., 1 F.R.D. 429; Egyes v. Magyar Nemzeti Bank, D.C.N.Y., 1 F.R.D. 498; Battin Amusement Co. v. Cocalis Amusement Co., D.C.N.J., 1 F.R.D. 769; Poole v. White, D.C.W.Va., 2 F.R.D. 40; Best Foods v. General Mills, Inc., D.C.Del., 3 F.R.D. 275.

■ The Rules of Procedure are to be understood and applied as a systematic and harmonious whole, not as detached and isolated paragraphs. Disproportionate emphasis may not prudently be accorded to the rule currently undergoing application, to the neglect of other prescriptions that illuminate its significance.

■ Thus, Rule 8(a)(2) must be kept in view in the administration of the other rules governing pleadings. And a plaintiff who, in compliance with it, has presented in his complaint "a short and plain statement of the claim showing that the pleader is entitled to relief," must be accorded immunity to a motion for a bill of particulars except to the extent that he may have stated his claim "in such general terms that defendant can not understand the general nature of the charges and can not frame an answer" to them. Martz v. Abbott, D.C. Pa., 2 F.R.D. 17; Smith v. Buckeye Incubator Co., D.C.Ohio, 2 F.R.D. 134; Mitchell v. Brown, D.C.Neb., 2 F.R.D. 325; Best Foods v. General Mills, D.C. Del., 3 F.R.D. 275; Brinley v. Lewis, D.C. Pa., 27 F.Supp. 313; Walling v. Black Diamond Coal Mining Co., D.C.Ky., 59 F.Supp. 348.

■ It is equally imperative that relief be not illogically granted through the allowance of a bill of particulars, for which provision is appropriately made under those other rules which have direct pertinence to the preparation for the trial of a cause upon its merits. Among these are the simplification of the issues, and the procurement of admissions of fact and of documents, under Rule 16; the taking of depositions under Rule 26; the presentation of interrogatories under Rule 33; the procedure for discovery and production of documents and other things under Rule 34; and requests for admissions under Rule 36. Specifically, matters of evidence may not properly be demanded under a motion for a bill of particulars. Sierocinski v. E. I. Du Pont De Nemours & Co., 3 Cir., 103 F.2d 843; Egyes v. Magyar Nemzeti Bank, D.C.N.Y., 1 F.R.D. 498; United States v. Johns-Manville, D.C.Ill., 1 F.R.D. 548; Gum, Inc., v. Gumakers of America, D.C. Pa., 1 F.R.D. 586; Battin Amusement Co. v. Cocalis Amusement Co., D.C.N.J., 1 F. R.D. 769; Martz v. Abbott, D.C.Pa., 2 F.R.D. 17; Stefaniak v. Boland, D.C.N.Y., 2 F.R.D. 110; Moorshead v. Fidelity & Casualty Co., D.C.Pa., 2 F.R.D. 157; Conmar Products Corp. v. Tibony, D.C.N.Y., 2 F.R.D. 169; Sinaiko Bros. Coal & Oil Co., v. Ethyl Gasoline Corp., D.C.N.Y., 2 F.R.D. 305; Holland v. Gurnsey, D.C.N.H., 3 F.R.D. 239; Brown v. Select Theatres Corp., D.C.Mass., 3 F.R.D. 499; Braden v. Callaway, D.C.Tenn., 4 F.R.D. 147; Bowles v. Anderson, D.C., 4 F.R.D. 181; American LaFrance-Foamite Corp. v. American Oil Co., D.C.Mass., 25 F.Supp. 386; Jessup & Moore Paper Co. v. West Virginia Pulp & Paper Co., D.C.Del., 25 F.Supp. 598; Southern Grocery Stores, Inc., v. Zoller Brewing Co., D.C.Iowa, 26 F.Supp. 858; Tully v. Howard, D.C.N.Y., 27 F.Supp. 6; Brinley v. Lewis, D.C.Pa., 27 F.Supp. 313; Massachusetts Bonding & Ins. Co. v. Harrisburg Trust Co., D.C.Pa., 27 F.Supp. 987; Laugharn v. Zimmelman, D.C.Cal., 28 F.

**530**

Supp. 348; Alabama Independent Service Station Ass'n v. Shell Petroleum Corp., D. C.Ala., 28 F.Supp. 386; Ferry-Hallock Co. v. Frost, D.C.N.Y., 29 F.Supp. 43; Modern Food Process Co., Inc., v. Chester Packing & Provision Co., D.C.Pa., 29 F.Supp. 405; Coca-Cola Co. v. Marbert Products Inc., D.C.N.Y., 29 F.Supp. 898; Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., D.C.Ark., 31 F.Supp. 483; Fleming v. Mason & Dixon Lines, D.C. Tenn., 42 F.Supp. 230; Bowles v. Schultz, D.C.N.H., 54 F.Supp. 708.

Upon those controlling legal considerations by which motions under Rule 12(e) are to be measured and decided, counsel are in general, though perhaps reluctant, agreement. For example, the plaintiff repeats the emphasis, of late frequently heard by the courts, upon Judge Charles E. Clark's argument, in Volume 25 of the Journal of the American Bar Association, at page 22, that the rule has not yet been limited with adequate precision, and that bills of particulars ought to be abolished altogether. Conversely, the defendants complain of the illogicality of the process by which the phrase "or to prepare for trial" has been degraded, so to speak, to the status of the vermiform appendix of our Rules of Civil Procedure, 28 U.S.C.A. following section 723c. But, so far, with no disparagement of its merit, Judge Clark's voice crying in the wilderness has not been heeded, and, "or to prepare for trial" continues to languish from the malady of judicially induced atrophy. So, their respective divergent dissents in principle from the inevitable having been recorded, counsel recognize that the motions for bills of particulars must be controlled by the test of the reasonable necessity of the bills to enable the defendants to answer the complaint. And that is the court's essential inquiry.

Two observations preliminary to the examination of the motions may be made. They are prompted by arguments in the plaintiff's behalf.

It is suggested that compliance with the demands of the defendants would be difficult, and entail delay, tedious inquiry, effort and expense on the plaintiff's part. But, however true that may be, it is no barrier to the determination of the motions upon their merits.

Secondly, the plaintiff points out that upon careful inspection the defendants' motions have been found to embrace "929 separate demands set forth in 124 main paragraphs further divided into 502 subparagraphs"; and, upon the authority of Wainer v. United States, 7 Cir., 82 F. 2d 305; Rockwood Co. v. Northwestern Fire & Marine Ins. Co., D.C.N.Y., 26 F.2d 824; Sawyer v. United States, 8 Cir., 89 F.2d 139; and Johnson v. United States, 4 Cir., 5 F.2d 471, argues that they should be denied on the score of their intrinsic extravagance and unreasonableness. That, in extreme instances, the denial of motions of this character upon those grounds has been defended by eminently respectable judicial opinion will not be denied. But this court is neither shocked nor affronted by the multiplicity of the particulars sought by the defendants. Without respect to their individual merit, the entire setting of this case explains, if it does not wholly justify, the scope of the requests. And the court has approached their consideration, entirely uninfluenced by their number, to whose computation or verification it has devoted neither time nor attention.

In their examination, no more of the extended language of the motions for bills of particulars will be formally synopsized than is considered to be indispensable to an understanding of their inquiries. And, first and principally, attention is devoted to the most exhaustive motion in which the railroad corporations and nearly all of the other defendants unite. With only a few exceptions, its requests essentially include those made in the other two motions, of which detailed analyses will not be set out in the present discussion. Its twenty-two general divisions allow a limited consolidation or regrouping with some variation from the order in which they were prepared. That will now be attempted. Its demands may be classified thus, all references, identifying paragraphs being to the complaint:

### Class I

(a) The date and place of making; the effective period; the identification of every person or corporation participating, as a member or agent, with the duration of such participation; the manner of making, whether oral or in writing, with copies of all writings, and substantial narration of all oral transactions, and the statement of any acts supporting an inference of concerted action; and the name of every conspirator; all in connection with each of some forty-one instances of the complaint's

allegations, in separate paragraphs, or parts of paragraphs, of unlawful joint action by the defendants, variously though here merely illustratively and not exclusively, characterized as "combination and conspiracy to monopolize," "combination and conspiracy in restraint of trade and commerce," "contracts," "agreements," "unlawful combination and conspiracy," "contracts, agreements, arrangements and understandings," "agreements between and among defendant railroads," "continuing agreement and concert of action," "concerted action," "collusive fixing of rates," "united front," "collaboration," and the like, which terms, along with sundry others of generally similar import, are employed in the complaint either in the making or in the amplification of allegations against the defendants of conspiracy and combination, and monopoly, both effected and attempted;

(b) The dates, or the applicable periods, the place or places; name of every participant, whether individual or corporate, party or agent, with the duration of his, her or its participation; the specific part or parts of commerce monopolized, or within the attempt to monopolize; the facts from which the power to monopolize or to attempt to monopolize is inferred; the facts from which intent to monopolize or attempt to monopolize is inferred; and the acts by which monopoly was achieved and maintained, or its attempt carried on with the names of all parties defendant participating therein; all in connection with the complaint's allegation in some seven places of "unlawful monopolizing" or "attempting to monopolize," or both;

(c) The time and place; the names of participants, individual or corporate, as parties or as agents; the nature of each act, or transaction; and the precise relation, if any, of each act to any agreement, understanding, or concert of action alleged in the complaint or as part of any monopoly, with the specification in each instance of the underlying agreement; all in connection with the complaint's employment in some eight designated places of one or more of the terms "unlawful acts," "unlawful transactions," "unlawful practices" and "conduct";

(d) The identification of the particular defendants who, within the allegations of paragraph 17 of the complaint, restrained the development and growth in the Western District of types of transportation other than railroads, and the times, places, and manner of such restraint, and the restrained types of transportation;

(e) (1) The identity of rates allegedly imposed upon shippers in the Western District discriminatorily favorable to eastern shippers, with details of the commodities affected, the several rates per unit of weight, origins, destinations, routes, and by what defendants and when the rates were respectively fixed; with like data touching the preferred rates in the allegedly favored Eastern District, all within the averments of paragraph 21(a); (2) minute details as to each freight rate and passenger fare involved, including, in the case of freight rates, the designation of each commodity involved, and the rates per unit of weight, and in the case of passenger fares, the class or kind of fares, and in the case of both, the points of origin and destination, routes, and the railroads over which they would have been available, and the identity of each defendant intercepting the employment thereof and the time of such interception, all in connection with allegations in paragraph 21(b), of the existence of a conspiracy to prevent railroads from putting into effect in the Western District freight rates and passenger fares without the approval of the defendants and unnamed coconspirators in the Eastern District; (3) the precise details as to each rate involved in the averment in paragraph 21(c) of a conspiracy to fix rates for the transportation of petroleum and its products both by rail and by pipeline at noncompetitive levels; (4) the exact location of each proposed spur track involved, together with the name of the railroad on whose lines it would have been located, the names and locations of the patrons involved, and the time and details of its prevention, in connection with the assertion in paragraph 21(d) of the prevention of construction of spur tracks for shippers and receivers of freight in the Western District as an objective of the conspiracy; (5) the time and place of deprivation of competitive transportation services, alleged in the same subparagraph, together with the nature and kind of the intercepted competitive transportation services, the identification of the defendants acting in such deprivation and the railroads over which and the commodities to which they might otherwise have been available, with precise details as to the affected rates; (6) data similar to that already requested in respect of

spur tracks, in reference to loading sheds, in connection with the allegation in paragraph 21(e) that the conspiracy had as an objective the prevention of the construction of loading sheds for shippers; (7) the specification, in connection with the allegation in paragraph 21(h) of the exaction from Western District shippers of certain accessorial charges, including charges for the use of heaters in potato cars, as an objective of the conspiracy, of the identity, kind and nature, commodities affected, origin and destinations of all such accessorial charges, and the identity of the railroads exacting them, and the points at, or between which, and the time or times within which, and the identity of the railroads by which, charges for heaters in potato cars were exacted; (8) the specification by name of railroads which could and would have furnished expedited freight and passenger service, and the points between, the times within, and the manner in, which it would have been furnished, in connection with the assertion in paragraph 21(i) of the withholding of expedited freight and passenger service, as an objective of the conspiracy; (9) in amplification of the allegation in paragraph 21(j) of the refusal to western shippers of grain and other products, of advantageous freight rates and transit privileges, otherwise obtainable from some of the defendant railroads as within the conspiracy's purpose, the identification of the railroads refusing such rates and privileges and the minute analysis of each of such rates and privileges; (10) the particularization of the claim in paragraph 21(k) that within the conspiracy's purview was the withholding from western shippers of divers available types of improved transportation equipment and facilities, by the identification of the withheld equipment and facilities, their kinds and types, the places, times, points of origin and destination involved, the withholding railroads, and the names and addresses of shippers thereby aggrieved; (11) the explanation of an allegation in paragraph 21(1) including within the conspiracy's scope, the delay and prevention of the installation of air-cooling equipment on cars in passenger trains in the Western District and the disconnection of such equipment on cars coming into the district, by setting out the railroads so offending and the precise manner in, and means by, and railroads on, which they delayed and prevented such installation, and the times and places of such disconnection; (12) in connection with the inclusion in the objects of the conspiracy, under paragraph 21(m) of the prohibition of the installation upon trains of the defendant railroads of recreational facilities, including motion pictures and radios, the identification of the offending railroads and the times and places of the prohibition and the railroads on which pictures and radios were excluded, the identification of any other excluded recreational facilities and the furnishing with respect thereto of the same data which is asked regarding pictures and radio; (13) in relation to the inclusion within the conspiracy's purpose in paragraph 21(n) of the refraining from solicitation of certain types of low rate passenger traffic, the setting out of the types of traffic thus involved, the names of the railroads refraining from their solicitation and the dates and places of such abstinence from solicitation; (14) in connection with the like specification in paragraph 21(o) of the elimination of competition by restriction of the right of individual railroads to advertise and solicit business, the naming of the restricting defendants, and the assertion of the precise manner and type of the restrictions, the persons or corporations on whom or which they were imposed, what railroads were restricted, and how competition was eliminated; (15) in connection with the specification in paragraph 21(p) of the fixing and determination of passenger fares as within the objects of the conspiracy, the naming of the defendants actually fixing and determining fares, the kinds of fares so fixed, and the origins and destinations and railroad routes involved, and the effective dates of the fares so fixed; (16) relatively identical data, including the exact commodities and rates involved, in connection with the like specification in paragraph 21(g) of the fixing and determination of freight rates; (17) in connection with the inclusion by paragraph 21(r) within the conspiracy's objects of the prevention of the granting by western railroads of reductions in passenger fares, the naming of the preventing defendants, the prevented railroads, the exact fares involved, including the origins and destinations and routes of travel, and exact fares therefor, and the dates when such fares would have been available; (18) relatively identical data, mutatis mutandis, respecting intercepted reductions in freight rates, under their specification in paragraph 21(s); and (19) in relation to the inclusion within the objects of the conspiracy, by paragraph 21(t) of the hindering

and prevention of the development and use of motor vehicle and other competitive modes of transportation, the identification of the repressing defendants, the "other modes" of transportation, the termini of routes available but for the hindrance and prevention, and the times, places, manner and means thereof;

(f) How, when, and through whom J. P. Morgan & Company, or its predecessor participated in the organization of AAR;

(g) The identification of means and methods, other than some specifically mentioned, of retarding the growth of the trucking industry, of precise state laws restricting trucking operations allegedly fostered by the conspiracy;

(h) In connection with the narrative allegation, in several paragraphs of the complaint, of an alleged arbitrary and conspiratory fixing, to the disadvantage and injury of the plaintiff as a shipper, of freight rates from Geneva, Utah to coastal points, the exact details respecting existing rates involved and comparable rates, all details including copies of writings relating to an alleged request or requests of the plaintiff through Defense Plant Corporation and Reconstruction Finance Corporation for reduction in rates for plaintiff's shipments and the asserted conspiratorial refusal of that request, together with many other particulars requested in numerous paragraphs of the motion, which it is considered to be unnecessary to set down at this point.

## Class II

In relation to the averment of injury to the area of the Western District, consequent upon conspiracy and combination and its practices, the exact delineation of the region; the locality or localities injured; the manner of impairment of the development of industry therein, together with the times, locations and nature of such impairment and the kind or kinds of industry affected; the manner of the diminution and restraint of trade and commerce, together with the times, locations and the kind or kinds of trade and commerce affected; the designation of the places and times of the interception of the growth of population; the residential location of people whose purchasing power has been curtailed and the manner and times of curtailment; the manner and times and the location of the adverse impact of the conspiracy on the national economy.

## Class III

In connection with an alleged formal threat by the defendants to persist in the conspiracy and monopoly; the identification of the defendants or agents of defendants so threatening; time and place of threats; the manner of the threats, with copies of any writings and a statement of exact language of oral threats.

## CLASS IV

The definition, or assertion of the intended meaning of many terms, including "national economy" (paragraph 16); "comparable service" (paragraph 21(a) ); "noncompetitive levels" (paragraph 21(c) ); "new low cost transportation" (paragraph 39); "arbitrary uniform and noncompetitive rates and charges" (paragraph 43); "substantial portion of the price paid by purchasers of such productions" (paragraph 44); "arbitrary, uniform and noncompetitive rates and charges" (paragraph 45).

## Class V

In connection with paragraph 23 of the complaint, a statement whether the plaintiff means to charge that all criticised action of the defendants has been taken by or through WARE, or in part through other instrumentalities, and if the latter, the designation of any such other instrumentalities by name and the identification of the time, place and manner of their use and by whom it has been made;

## Class VI

(a) The nature of the "private rate making machinery" of the defendant railroads referred to in paragraph 27, including the names of the associations or organizations comprising the same, if any there be;

(b) The identification by their names of the "western rate bureaus" and "rate making associations" referred to in paragraph 29, and an explicit statement whether such reference is identical with a somewhat similar reference in paragraph 27;

(c) The identification by names of the "bodies subordinate" to WARE referred to in paragraph 30;

(d) The identification of persons, firms or corporations (patently not parties defendant to this suit), who are referred to in various places in the complaint as "co-conspirators" of the defendants, but, so far, without other particularity or identification;

(e) A statement whether the "private rate fixing machinery" referred to in paragraph 49(2) is identical with that referred to in paragraphs 27 and 29.

### Class VII

In connection with the plaintiff's analysis of the "effects of the offenses charged": (a) The designation of names and addresses of financial, industrial and railroad interests allegedly vested with control over rates, etc.; and (b) the identification of the low cost transportation of which the public has allegedly been deprived and of newer and more economical forms of transportation similarly withheld.

### Class VIII

In connection with the alleged abandonment of the Western Agreement, the setting out by whom an alleged statement was made to the Department of Justice that an amendment had been made canceling said agreement as of April 23, 1943, and also in what manner and by whom the practices of the Western Agreement have been continued since April 23, 1943 and what practices have been so continued.

### Class IX

In connection with the allegation in paragraph 24 of the adoption of resolutions and the taking of action by AAR designed to prevent the defendant railroads from reducing rates and fares and making improvements in services and facilities; the date or dates of any such resolution or resolutions; the precise description of any other action taken by the association for the challenged purpose, together with the time thereof and the person or persons acting in behalf of AAR; the railroads deterred from reducing rates and fares or making improvements, and the times and places of such course; the designation of the exact reductions in rates and fares and the improvements intercepted, together with the times of all such actions; the commodities involved, and the amounts of rates in terms of money per unit of weight; the origins, destinations, and routes to which the rates and fares would have applied; the exact nature and kind of improvements intercepted and the railroads, the locations, origins and destinations involved;

### Class X

In connection with the general material which, primarily, the motions to strike sought to dismiss from the complaint, involving action taken in respect of rates, fares, services and the like; a specific statement or specific statements whether or not each thing alleged therein to have been done or omitted was in compliance with and approved by Certificate 44; and if it be claimed not to be so in compliance with and approved by said certificate, the ground of, and reason for, such claims; and if it be admittedly in compliance with and approved by the certificate, the ground and theory on which the plaintiff has sought to commence this action in view of the prohibitory language of Section 12.

It is freely acknowledged that the foregoing outline of the motion is sharply abbreviated and that it is designed to be suggestive rather than exhaustive. It is thought, however, that details of requests not directly adverted to therein quite generally fall into one or more of the classes arbitrarily utilized in the outline.

■ The requests grouped under Class VI are being granted.

It is not considered that in preparing their answers the defendants should be required, at their peril, to appraise the scope of the plaintiff's term "private rate making machinery." It is not a phrase in general employment. On the contrary, it appears to be an expression of recent composition, fostered, if not created, by one of the plaintiff's attorneys in the present case. His authority to give a final sanction to words and phrases of our language is somewhat less substantially documented than that which Horace proclaims as the prerogative of the writer of poetry.

Then, the oblique and dubious manner in which conspiratory and monopolistic utilization of rate bureaus, however characterized, is alleged in the complaint prompts the court to require the plaintiff to say explicitly what agencies it means thus to identify in its pleading. Similarly, it should name the "bodies subordinate" to WARE which it has in view.

And, repeatedly throughout the complaint the defendants are charged, either directly or by necessary inference, with acting in conspiratory concert with "co-conspirators" beyond their own obviously substantial number. Let the plaintiff declare who, or what partnership or corporate organizations, are within the coverage of the epithet, "co-conspirators." Without further comment, it may be noted here that sundry requests for the same information

respecting "co-conspirators" in the Kuhn, Loeb & Co. motion and one such request in the Lamont-J. P. Morgan & Co. motion are also being granted.

In all other respects, the motion just outlined is being denied and overruled. This course is followed because the court is fully satisfied that, without the material sought, the complaint sets forth its claims under the Sherman Act with sufficient detail and clarity to enable the defendants severally to answer them. In this ruling there is no possible implication to the effect that the defendants will not be entitled, before, and directly incident to the trial of the case on its merits, and upon appropriate inquiry, to receive some measure of the information they have thus early demanded. Similarly, the court refrains from any suggestion touching the extent to which such later inquiry may appropriately be prosecuted.

Directly in this connection, the court has not overlooked the argument by the defendants that their present requests for bills of particulars ought to be regarded with a special measure of indulgence because, hereafter, the plaintiff, through the Department of Justice, may withhold that degree of bona fide and frank participation in the several pretrial processes subsequent to answer, which is contemplated by the specific rules for that service, already identified. Without needless elaboration, it may be said that the court is not wholly inexperienced in the problem which the defendants suggest. It is reluctant, however, to suppose that in this case the plaintiff, which has resisted the allowance of the defendants' demands for particulars, upon the express ground, among many others, that the resources of the rules for timely discovery are available, will hereafter seek to nullify the employment of those resources. And it need not be added that the court is not entirely helpless in the face of the recalcitrance of a litigant, even though the offender be the United States itself, especially when, as the plaintiff, it is the moving party seeking the affirmative action of the court.

However, understood, the demands of Classes I, II, III, VII, VIII, and IX are for evidentiary material; and in most respects, it may be added, in almost microscopic detail. The essential ultimate facts have been alleged in the complaint. What is being denied in the instant ruling is the compulsory narration of the primary or evidentiary facts, those elemental details upon which the plaintiff has presumably based its averment of the ultimate facts.

Even in ordinary litigation, such evidence need not be pleaded. And it has frequently been recognized, that, from the very nature of actions brought under the Sherman Act, the plaintiff must be allowed a substantial generality in the assertion of his facts. In these cases, especially under the current rules of procedure, "it is not necessary to set out in detail the acts complained of nor the circumstances from which the pleader draws his conclusions that violations of the acts of Congress have occurred." Louisiana Farmers' Protective Union v. Great Atlantic & Pacific Tea Co., 8 Cir., 131 F.2d 419, 422; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Loewe v. Lawlor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815; C. E. Stevens Co. v. Foster & Kleiser Co., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173; Hicks v. Bekins Moving & Storage Co., 9 Cir., 87 F.2d 583; Ballard Oil Terminal Corp. v. Mexican Petroleum Corp., 1 Cir., 28 F.2d 91; Mitchell Woodbury Corp. v. Albert Pick-Barth Co., 1 Cir., 41 F.2d 148; United States v. Johns-Manville, D.C.Ill., 1 F.R.D. 548; Stewart-Warner Corp. v. Staley, D.C.Pa., 42 F.Supp. 140; Luebke & Co. v. Manhardt, D.C.Wis., 37 F.Supp. 13; Metzger v. Breeze Corporations, D.C.N.J., 37 F.Supp. 693; Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co., D.C. Ky., 37 F.Supp. 728; Buckeye Powder Co. v. E. I. Du Pont de Nemours Powder Co., D.C.N.J., 196 F. 514; United States v. Sugar Institute, D.C.N.Y., 51 F.2d 1066; C. F. Simonin's Sons v. American Can Co., D.C.Pa., 30 F.Supp. 901; Makan Amusement Corp. v. Trenton-New Brunswick Theatres Co., D.C.N.J., 3 F.R.D. 429. It is quite true that several of the cited cases arose otherwise than on motions for bills of particulars, some upon demurrers or motions to dismiss; but all of them are instructive because of their examination of the detail in which the courts may expect a case to be stated under the law here relied upon.

That in many instances, searching and exhaustive motions for bills of particulars have been granted in suits brought under the Sherman Act is readily recognized. United States v. Schine Chain Theatres, D.C.N.Y., 1 F.R.D. 205; United States v. Griffith Amusement Co., D.C.Okl., 1 F.R.D.

229; Lowe v. Consolidated Edison Co., D. C.N.Y., 1 F.R.D. 559; United States v. American Solvents & Chemical Corp., D.C. Del., 30 F.Supp. 107 (by interrogatories before answer); Twin Ports Oil Co. v. Pure Oil Co., D.C.Minn., 46 F.Supp. 149. This court does not profess to be able to reconcile the application, in those and other cases relied on by the defendants, of the acknowledged test for rulings upon motions under Rule 12(e), with its employment in those of the cases cited in the immediately preceding paragraph and other similar suits which arose after the effective date of the Rules of Civil Procedure. It may be doubted whether perfect consistency in the ultimate application of rules of procedure in all individual cases may prudently be sought. Certainly it can not be achieved. And a persistent demand for its realization would destroy the very flexibility in pleading which the Federal Rules of Civil Procedure are designed to promote.

The request designated by Class IV is for the definition, in the course of pleading, of many terms or phrases, the meaning of each of which in its context seems to the court to be reasonably clear and unmistakable. As to the demand of Class V, the court is satisfied that the complaint may not reasonably be construed as charging that all criticised action of the defendants was taken through WARE. But it is considered that, upon the plaintiff's compliance with the requests of Class VI, it will probably have identified the other instrumentalities within its stricture.

The material within the contemplation of Class X may more appropriately be set out in an answer. The request, in part, is for a discussion of the plaintiff's legal position upon the point involved. In its entirety, it should be covered in the defendants' answers.

The defendants argue that if all of their requests were granted and complied with, they might thereby be enabled to answer more directly, exactly, briefly, and without equivocation. Presumably, that is true. It may even be highly desirable, though upon that point the court expresses no opinion. But it does not appear to be a consideration that is controlling in the application of Rule 12(e). Whatever counsel, or the writer of this opinion, may think about the extreme desirability of certainty and finality in pleading, the present rules do not aim exclusively at its realization. For,

under Rule 8(e) (2), "A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. * * * A party may also state as many separate claims or defenses as he has regardless of consistency." If a plaintiff's complaint appropriately evokes an inconsistent, alternative or hypothetical answer, the fault, if any, appears to lie with the plaintiff. who must suffer without relief from the uncertainty in which the answer may leave him.

After the oral argument upon the motions now under consideration, the Supreme Court of the United States, by a ruling in State of Georgia v. Pennsylvania Railroad Co., supra, granted in part, and otherwise overruled and denied, motions for bills of particulars in that case. Thereafter, counsel in the instant case presented to this court in separate memoranda their respective views touching the impact of that ruling upon the present motions. And this court has carefully considered those views and that ruling, in the light of the entire motions upon which the Supreme Court ruled.

Serious doubt may be entertained whether the Supreme Court's action could be more than suggestive in this submission. This court, in its present effort, is acting under, and bound by, Rule 12(e); in administering which, it must endeavor to observe the interpretation and construction that have come to be virtually a part of the rule (vide supra). The Supreme Court is not thus circumscribed. The Federal Rules of Civil Procedure, though promulgated by the Supreme Court under a congressional grant of power, are solely for the guidance of, and for observance by, the District Courts; and have not been made applicable to cases brought in the Supreme Court within its original jurisdiction. Counsel appearing in the Georgia case, in their briefs before the Supreme Court, recognized that situation and the uncertainty whether the Federal Rules of Civil Procedure were entitled to any controlling consideration whatsoever in that forum, or whether it was obliged to observe any precise canons of procedure. It was there contended, and in substantial measure agreed by counsel, that in its ruling the Supreme Court might appropriately observe the underlying thought of Rule 12(e), which it had itself devised for the formulation of issues in cases pending in the ordinary

trial courts of the federal judicial system. Whether the Supreme Court followed that suggestion is quite uncertain, because its ruling was not accompanied by any explanatory comment (so far as counsel here have informed this court).

But, the ruling of the Supreme Court thus made is not directly or exactly instructive in this case. To be sure, it denied many requests for information comparable to many of the demands of the defendants that are rejected here. But it did grant requests for statements of particulars, in certain instances extending to details which this court is not requiring the plaintiff to set out. Upon mature and respectful consideration of that ruling, this court, although not intolerant of a contrary view, is of the opinion that the basic facts of conspiracy, combination and monopoly and the technique thereof, while essentially similar in the Georgia case and this action, were not set out in the amended complaint filed in the Georgia case nearly as adequately as they are alleged here. Paragraphs 9 to 16 inclusive, of Georgia's pleading, and more particularly paragraphs 9, 10 and 11, contain the material for that purpose; and it is not comparable in the detail in which it is there set out with similar averments of the complaint now before this court. Then, the variety of capacities in which the State of Georgia undertakes to maintain its action imposes upon it as plaintiff the burden of pleading and establishing—beyond the existence of conspiracy or combination or monopoly, whether attempted or accomplished—the adverse consequence to itself and its citizens of the illegal actions that it challenges. And this obligation involves further and more detailed pleading than is required of the United States, proceeding in its sovereign capacity under 15 U.S.C.A. § 4.

In the final section of the motion of Kuhn, Loeb & Co., all of the demands of the motion for bill of particulars already reviewed are by reference incorporated into its motion, and asserted by Kuhn, Loeb & Co. The ruling already announced will operate automatically as a like ruling in respect of the incorporated demands of Kuhn, Loeb & Co.

Aside from their requests for the identification of presently anonymous "co-conspirators" of the defendants, the separate motions of Kuhn, Loeb & Co. and of Thomas W. Lamont and J. P. Morgan & Co. ask for statements of the exact details of the participation of the respective moving corporate defendants and their alleged respective individual representatives in the associations or boards allegedly utilized by the conspiracy. And their requests are extremely minute.

By way of example, the Lamont-Morgan motion, in respect of the plaintiff's allegation that the defendant Lamont represented and acted for the defendant J. P. Morgan & Co. on the "Committee of Directors" and in the combinations, conspiracies and offenses alleged in the complaint, demands a statement of the term of Lamont's service on the Committee of Directors, the dates of its meetings attended by Lamont, and the manner in which Lamont represented and acted for J. P. Morgan & Co. on the committee, and the identification of the combination, conspiracies and offenses in which Lamont participated and his precise action in furtherance thereof. With reference to like allegation of action by Sir William Wiseman for it, Kuhn, Loeb & Co. demands the citation of the precise period of his action upon the committee and upon each such combination and conspiracy, and in each such offense.

Their other requests are equally searching. Generally, it may be said that by their separate motions, the two banking groups seek the same material for which the other defendants asked, but with direct and specific reference to the several defendants in those two motions, and, it is believed, in more narrow particularity than is sought in the longer motion of the more numerous defendants.

■ In those motions, as in the one first considered, requests of that nature are regarded as demands for evidentiary information. And they are, accordingly, denied. Contributing to that ruling, in connection with averments by the plaintiff of acts on the part of the two corporate moving banking parties and the designated individual representative of each of them, is the court's conclusion that the individual representative in each instance, and through him his alleged corporate principal, may be expected to know, first whether any participation by the individual in the challenged conduct actually occurred, and if so, the particulars thereof. And upon the basis of such knowledge, both the corporate moving defendants and the defendant Lamont can very readily answer the charge.

■ In several instances, both the Kuhn, Loeb & Co. and the Lamont-J. P. Morgan & Co. motions seek statements as

to when the plaintiff contends that the moving party or parties, as the case may be, entered into a particular phase of the conspiratory or monopolistic enterprise then under inquiry. And Kuhn, Loeb & Co. especially asks for explicit statements whether the plaintiff means to include it among "the defendants," "other defendants," "said defendants," and "defendants," where, in numerous paragraphs, the complaint charges action by parties so designated. But to the court it appears to be clear beyond reasonable uncertainty that the plaintiff alleges that all of the defendants were members of the challenged conspiracy and monopoly from their inception, and participants in their purposes and acts, save on a few occasions, whose actors are expressly limited to certain designated defendants.

 Counsel for all of the defendants, stressing the magnitude and complexity of the operations within the reach of the plaintiff's accusations, remind the writer of this memorandum of his own language in Mitchell v. Brown, D.C.Neb., 2 F.R.D. 325, a suit by a single employee under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. wherein he denied a bill of particulars and mentioned that the business of the defendants then before the court was a single small unit and not a far flung enterprise. That reflection touching the Brown restaurant, along especially with the equally stressed statutory obligation of the Browns to keep records of the very things about which Mitchell complained, warranted the court's inference that the Browns knew better than Mitchell the primary facts underlying Mitchell's complaint. On other occasions, as well as in Mitchell v. Brown, this court has followed the well fortified reasoning that the narrowness and simplicity of a moving party's business operation, generally in association with other considerations, warrant an inference that he knows its details, especially when they have to do with payrolls and the costs and selling prices of goods, and the like. But a case of the present character, it need not be repeated, is somewhat sui generis in the manner of its averment. And the admittedly stupendous scope, volume and multifariousness of the business of the defendants, both individually and in the aggregate, do not impose upon the plaintiff the obligation to particularize its complaint beyond the degree which has frequently been sanctioned judicially as adequate (vide supra). For that sanction has been given in several opinions which dealt with business operations of notable variety, intricacy, size and territorial sweep. Those involved here may, indeed, be—as it has been argued they are—larger and more comprehensive than the business within the scope of any other case thus far brought under the Antitrust Act. But the distinction is only in degree.

From the foregoing discussion, the scope of, and motivating considerations underlying, the court's ruling upon the several motions for bills of particulars ought, it is believed, to be manifest.

An order accordingly has been prepared under the court's direction and, after being duly signed, is filed along with this opinion.